IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

APR 09 1998

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| vs. | § | CRIMINAL NO. B-93-009 |
| | § | |
| JUAN RAUL GARZA, | § | |
| Defendant-Movant. | § | |
| (CIVIL ACTION NO. B-97-_273_) | § | |

### UNITED STATES' ANSWER, MOTION TO DENY RELIEF UNDER RULE 8(A), 28 U.S.C. FOLL. § 2255, AND SUPPORTING BRIEF

The United States of America, Plaintiff-Respondent, by the United States Attorney for the

Southern District of Texas, moves this court to deny relief under Rule 8(a), 28 U.S.C. foll. §

2255.

1.    **Jurisdiction.**  This court has jurisdiction under 28 U.S.C. § 2255.

To the extent that Garza moves for a new trial pursuant to FED. R. CRIM. P. 33, this court

is without jurisdiction to entertain it.  A motion for new trial under FED. R. CRIM. P. 33 "shall

be made within 7 days after verdict or finding of guilty or within such further time as the court

may fix within the 7-day period."  Because Garza's motion is in excess of that period, he is limited

to the newly discovered evidence provisions under Rule 33.  *United States v. Jones*, 597 F.2d

485, 488 (5th Cir. 1979), *cert. denied*, 444 U.S. 1043, 100 S.Ct. 729 (1980)("After seven days

from the date of the verdict, a motion for new trial cannot be entertained unless it is based on

newly discovered  evidence.");  *United States v. Beasley*, 582 F.2d 337, 339 (5th Cir.

1978)("Because seven days have long passed, even as tolled by the filing of an appeal, the sole

basis for the present motion must be newly discovered evidence").  Garza's claims are not of that

genre.

2.    **Procedural history**. Garza and 15 others were originally indicted in this court on February 3, 1992, in this court under Criminal No. B-92-034-01 for conspiracy to import and to possess in excess of 1000 pounds of marihuana. At the time of that original indictment he was a fugitive from justice. That indictment was subsequently dismissed. Garza and four codefendants (Jorge Vela, Jose Luis Garza Valdez, Antonio Alvarado and Manuel Flores) were indicted on January 5, 1993, under this criminal action number. Specifically, Garza was charged with the following conspiracy offenses alleged to have occurred on or about January 1, 1982 through November 6, 1992:  count 1 - conspiracy to import in excess of 1000 kilograms of marihuana in violation of 21 U.S.C. §§ 963, 952(a)(2), and 960(b)(1)(G); count 2 - conspiracy to possess in excess of 1000 kilograms of marihuana in violation of 21 U.S.C. §§ 846, 841(a)(1) and (b)(1)(A)(vii). He was also separately indicted for aiding and abetting the substantive offense of possession with intent to distribute marihuana in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B) or (C) and 18 U.S.C. § 2 as follows: count 3 - on or about January 1, 1991 to January 14, 1991, the possession of approximately 163.6 kilograms (360 pounds); count 4 - on or about December 1, 1991 to January 22, 1992, the possession of approximately 95.4 kilograms (210) pounds; and count 5 - on or about December 1, 1989 to January 1, 1990, the possession of approximately 596.3 kilograms (1312 pounds). Count 6 charged Garza with engaging in a Continuing Criminal Enterprise, in violation of 21 U.S.C. §§ 848(a) and 848(c) and 18 U.S.C. § 2, during the period January 1, 1982 through November 6, 1992. Counts 7-9 charged Garza with engaging in a Continuing Criminal Enterprise and with killing Thomas Albert Rumbo (count 7), Gilbert Matos (count 8) and Erasmo De La Fuente (count 9) in furtherance of that enterprise in violation of 21 U.S.C. §§ 848(a), 848(c), and 848(e)(1)(A) and 18 U.S.C. § 2. Finally, he

-2-

was charged in count 10 with aiding and abetting money laundering (approximately $273,655) in violation of 18 U.S.C. § 1956(a)(1)(A)(i) and 18 U.S.C. § 2.

On January 7, 1993, the government gave notice of its intent to seek the death penalty for the murders of Rumbo, Matos and De La Fuente. Other aggravating factors listed in the government's notice were the April 1991 murder of Oscar Cantu and the May 1991 murder of Antonio Nieto. This notice was subsequently amended on February 12, 1993, over Garza's objection, to include the February 8, 1993 murder of Diana Flores Villareal. It was amended again on March 29, 1993 and April 20, 1993, to include the murders of Fernando Escobar Garcia and Bernabe Sosa. On June 25, 1993, the government gave notice of its intent to introduce evidence of violent acts.

On July 29, 1993, the jury returned a verdict of guilty to all counts of the indictment. Following a punishment hearing as required by statute, Garza was sentenced to death for each of the three murders. For the remaining counts, he was sentenced to concurrent terms of imprisonment for life (counts 1-2, 6), 40 years (counts 3, 5), and 20 years (counts 4, 10).

Garza appealed his conviction and sentence. On September 1, 1995, the United States Court of Appeals for the Fifth Circuit affirmed in its entirety.[1] *United States v. Flores and Garza,*

---

[1] The United States interpreted Garza's appeal to raise the following claims: 1) Whether the district court correctly instructed the jury as to its sentencing options under 21 U.S.C. § 848(e)(1)(A); 2) whether 21 U.S.C. § 848(e) properly narrows the class of persons eligible for the death penalty; 3) whether "substantial planning and premeditation" under 21 U.S.C. § 848(n)(8) is a constitutionally permissible aggravating factor; 4) whether the district court correctly instructed the jury in its consideration of the aggravating and mitigating sentencing factors; 5) whether the district court's voir dire procedures were constitutionally and procedurally sufficient; 6) whether the district court properly granted the government's challenges for cause for *Witherspoon*-excludable jurors; 7) whether the district court properly denied Garza's challenges for cause to eight venire members; 8) whether the district court abused its discretion in denying Garza a continuance for additional pretrial discovery; 9) whether the government properly complied with *Brady* and the Jencks Act; 10) whether the government properly complied with Fed. R. Crim. P. 16(a); 11) whether the

-3-

63 F.3d 1342 (5th Cir. 1995). Rehearing was denied on December 15, 1995. *United States v. Garza*, 77 F.3d 481 (5th Cir. 1995)(table). Garza subsequently petitioned the Supreme Court for certiorari review and relief was denied on October 7, 1996 *United States v. Garza*, ___ U.S. ___, 117 S.Ct. 87 (1996). Rehearing was denied on December 2, 1996. *United States v. Garza*, ___ U.S. __, 117 S.Ct. 542 (1996). The Department of Justice has not scheduled any execution date.

Exhausting his one-year statute of limitations period to the day, Garza filed the instant motion to vacate sentence on December 2, 1997.

3.    **Transcripts.**   The transcripts of the trial and sentencing are on file with this court.

4.    **Evidentiary hearing.**   The allegations raised by Garza may properly be resolved on the basis of the record before this court, which conclusively shows that no relief is appropriate. Garza does not request an evidentiary hearing and none is required. *United States v Smith*, 915 F.2d 959, 964 (5th Cir. 1990); *United States v Santora*, 711 F.2d 41 (5th Cir. 1983). Under Rule 8(a), this court shall make such disposition of the motion as justice dictates.

5.    **Allegations.**   Garza raises the following claims in support for his petition:

1)    Whether Garza was denied an Eighth Amendment right to meaningful appellate review by the Fifth Circuit. Garza contends that the Fifth Circuit affirmed his death sentence on

---

government's objections at closing argument denied Garza a fair trial; 12) whether the district court correctly admitted the November 1-6, 1992 tape recorded conversations between Garza and Bordayo; 13)whether the recorded conversations made between November 28-December 17, 1991, were properly authenticated; 14) whether the district judge exceeded his role as a neutral magistrate; 15) whether the elements of 18 U.S.C. § 1956(a)(1)(A)(i) were properly alleged in the indictment; 16) whether law enforcement authorities had probable cause to effectuate the November 14, 1989 search and seizure; 17) whether the district court properly admitted into evidence a photograph of the interior of victim Matos' car; 18) whether hearsay evidence is admissible at the punishment phase of a federal capital murder trial.

9

direct appeal without considering his constitutional challenge to the evidence of eleven aggravating circumstances that the jurors were instructed to weigh against the mitigating factors.

2)     Whether Garza was denied his right to due process at the punishment phase of his capital murder trial by the jury's consideration of evidence of four unadjudicated extraneous murders committed in Mexico because he did not have a fair opportunity to explain or deny the government's evidence against him.

3)     Whether Garza was denied effective assistance of counsel on direct appeal.

**6.     Answer and Motion to Dismiss: The Fifth Circuit Properly Reviewed Each Claim Garza Raised on Direct Appeal.**

In his first ground for relief, Garza complains that he was denied his Eighth Amendment right to meaningful appellate review. Specifically, he complains that the Fifth Circuit failed to review "his due process challenge to eleven aggravating circumstances that were based on evidence of his involvement in four uncharged murders in Mexico." The remedy he requests is "an opportunity to file a new direct appeal of the claim. . . ."

Garza's claim is without merit for several reasons. First, Garza makes no claim that the Federal death penalty scheme is unconstitutional because it fails to provide for meaningful appellate review. Nor can he as review is expressly provided under (q).

Second, the record reflects that the Fifth Circuit in fact considered each of the claims that Garza raised and specifically rejected them. In claim number 8 on direct appeal, Garza argued to the Fifth Circuit that this court denied him an adequate opportunity to prepare his defense because it denied adequate preparation time, permitted belated notice of aggravating factors, permitted the government to file a bogus witness list and interfered with Garza's access to witnesses, tolerated the government withholding critical, discoverable information, and otherwise

deprived him of the right to a fair trial. Each of these claims was addressed by the Fifth Circuit. *Garza*, 63 F.3d at 1363-1366. Garza raised the issue of "belated disclosure of foreign homicides" as denying him the opportunity to present his defense within his challenge to the notice of evidence in aggravation. *Garza's brief* at 92. Conceding that 21 U.S.C. § 848(j) allows for the introduction of sentencing evidence without regard to its admissibility under the federal rules of evidence, Garza claimed that it was "inappropriate" to consider evidence of the foreign murders because the United States did not have "subject matter jurisdiction" over actions in occurring in a foreign country. He did not connect this argument to any due process claim raised or apply the argument to his particular sentencing. Garza was neither indicted nor tried for the murders committed in Mexico.

Garza's argument that he lacked subpoena power in Mexico was raised in the context of his being denied sufficient time, notice and discovery to prepare for the sentencing hearing. The United States argued in response that Garza failed to specify any particular discovery request relating to the foreign homicides that was refused by this court. *United States' brief* at 123-24 n. 30. The Fifth Circuit addressed his "insufficient notice of the facts and information underlying the aggravating factors" claim in that context, specifically finding that Garza "does not point to any failure of the government to comply with the district court's discovery orders and does not argue that the court erred by failing to order discovery of aggravating evidence." *Garza*, 63 F.3d at 1364. Thus, to the extent that Garza argues the Fifth Circuit failed to address each of his claims raised, his allegation is factually incorrect.

Third, the Fifth Circuit carefully and exhaustively reviewed the penalty phase of Garza's trial in accordance with 21 U.S.C. § 848(q). *Garza*, 63 F.3d at 1366-1376. This section provides

that the "court of appeals shall consider the record, the evidence submitted during trial, the information submitted during the sentencing hearing, the procedures employed in the sentencing hearing, and the special findings returned under this section." Subsection (q)(3)(B) provides that the sentence shall be affirmed if the court determines that "the information supports the special finding of the existence of every aggravating factor upon which the sentence was based, together with, or the failure to find, any mitigating factors as set forth or allowed in this section." The Fifth Circuit was expressly aware of this standard and applied it to its review. *Garza*, 63 F.3d at 1373 n. 34.

As the Eleventh Circuit found in *United States v. Chandler*, 996 F.2d 1073, 1082-83 (11th Cir. 1993), *cert. denied*, 512 U.S. 1227, 114 S.Ct. 2724 (1994), which presented an overview of the § 848 scheme that was expressly adopted by the Fifth Circuit, *Garza*, 63 F.3d at 1366 n.28, § 848(q) serves to emphasize the serious nature of capital cases and the importance of careful review. However, "[t]here is nothing in these sections that alter a federal appellate court's ordinary standards of review." 996 F.2d at 1083. The Federal Rules of Appellate Procedure permit affirmance without written opinion in appropriate cases. FED. R. APP. P. 47, LOC. R. 47.6. To the extent that it could be legitimately argued the Fifth Circuit employed such procedure to its review of one or more of Garza's claims, it implicates no Due Process or Eighth Amendment concern.[2]

Finally, Garza cites no authority to support his request that this court may assess the adequacy of a higher court's review and grant him a new direct appeal under 28 U.S.C. § 2255.

---

[2]Garza's reliance on *Smith v. Digmon*, 434 U.S. 332, 333, 98 S.Ct. 597, 598-99 (1978) is misplace. *Smith* concerned the exhaustion of state remedies under 28 U.S.C. § 2254(d), an issue totally inapposite to this case.

-7-

Whatever complaint he had to the adequacy of the Fifth Circuit's review should have been presented to the United States Supreme Court on petition for writ of certiorari review. No such claim was presented. Garza challenged only the constitutionality of the capital sentencing scheme in 21 U.S.C. § 848(e), *et seq.*, which treats a defendant's culpability as a threshold aggravating factor, as inadequately narrowing the class of death-eligible defendants, and whether this court violated the rule in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187 (1994). This court may not assess the adequacy of a higher court's review.

7.    **Garza Was Not Denied Any Due Process Right at the Punishment Phase of His Trial.**

Garza complains that he was denied his Fifth Amendment right to Due Process of law at his sentencing hearing because he was denied a fair opportunity to deny or explain the government's evidence as to his involvement in the extraneous, unadjudicated murders of four accomplices in Mexico. Specifically, he complains that he could not effectively defend himself against these accusations because he did not have compulsory process in Mexico, that he could not discover exculpatory evidence that the Mexican police possessed and that he had no safeguards against police misconduct in that foreign country. *Garza's petition* at 9.

A)    Statement of facts applicable to Garza's claim.

1)    Notice of aggravating factors and discovery.

The United States gave notice of its intent to seek the death penalty on January 7, 1993, for the murders of Gilberto Matos, Thomas Rumbo and Erasmo De La Fuente. In this notice, the United States additionally listed as aggravating factors the 1991 murder of Oscar Cantu, the 1991 murder of Antonio Nieto, and 1992 murder of Bernabe Sosa. This notice was subsequently amended on February 12, 1993, over Garza's objection, to include the February 8, 1993 murder

-8-

of Diana Flores Villareal (Dkt. 1270-77).  It was amended again on March 29, 1993 and April 20, 1993, to include the murders of Fernando Escobar Garcia and Bernade Sosa (Dkt. 1014-25). On June 25, 1993, the government gave notice of its intent to introduce evidence of violent acts (Dkt. 652-53).

With respect to discovery relevant to the issues raised on collateral attack (*See United States' brief on appeal* in the section entitled "facts relating to discovery matters and continuances, pages 106-117, for an exhaustive discussion of the discovery provided by the United States), at the March 3, 1993 pretrial conference the United States advised the court that it had mailed to the defense copies of the first 264 exhibits and it tendered exhibits 265-322 at the hearing. The United States agreed, as continuing obligation, to turn over the police reports of the murders (Dkt. 190, p. 31).  The United States specifically advised the court that it believed those pathology and lab reports had been received and turned over.  On May 28, 1993, Garza complained that he needed additional time to decipher the Mexican autopsy reports for Fernando Escobar-Garcia.  The United States disputed Garza's contention that it had failed to turn over the different Mexican autopsy and investigative reports. The only delay had been in obtaining the "corrected" transcriptions that were "certified translations from the official court interpreter."  Those transcriptions were turned over at that time, more six weeks before the United States began its presentation of evidence at the guilt phase of trial on July 12, 1993, and two month before Garza's sentencing hearing began on July 29, 1993 (Dkt. 399, p. 103-04, 116-17).

Two weeks before the guilt phase of trial, on June 28, 1993, counsel for the defense made a second supplementary *Brady* motion requesting arrest records and police department files relating to any other individual who might have been arrested in connection with the murders both

4

in the United States and Mexico, complaining that the defense did not have the power to get those records from the Mexican authorities (Dkt. 400, p. 21-22). When asked to be more specific, defense counsel replied that he wanted arrest records and police files (both United States and Mexico) of other individuals who had been arrested in connection with the murders (Dkt. 400, p. 23). The government responded that the only person arrested in connection with the murders was Juan Jose Stevens and the report was made available to the defense. Further, there were some individuals who, at various times, had been questioned during the investigation. By the time of the hearing, the United States had already turned over that information to the defense, along with all of the Jencks Act material and *all* relevant officer's reports in its possession and knowledge, and that any information would be contained in those reports (Dkt. 400, p. 23-27).

With respect to the murders in Mexico, the United States expressly averred that it "had turned over to them every single document that we received from Mexico, including the police reports." (Dkt. 400, p. 26). Defense counsel at this point requested that the court order the United States to conduct defense discovery by making further inquiries as to the investigations that took place in Mexico (Dkt. 400, p. 26). The court told the defense that it would have to identify the evidence and explain why the defense could not "go get it yourself." (Dkt. 400, p. 26-27). The defense replied in response that it did not have subpoena power in Mexico (Dkt. 400, p. 27). The court then ordered the United States to make available any record regarding any Mexican investigation that was known to the government, and the prosecutor replied that "we do not know of anything that has not already been turned over to the defense" (Dkt. 400, p. 27). The court reminded the United States of its continuing duty to turn over any exculpatory evidence known to the government (Dkt. 400, p. 27).

At the June 30, 1993 pretrial hearing, the defense again accused the United States of as having failed to turn over "numerous documents that were being translated and certified." When pressed by the court to be specific, defense counsel clarified that he was referring to the Mexican autopsy reports, to which the government advised that they had "long since been corrected" and the "defense have been given copies of everything" (Dkt. 400, p. 192-94). Apparently frustrated with the defense's continuing and unfounded accusation that the government had not complied with its promises of providing discovery, the government advised the court that it had kept a log of all information released to the defense (Dkt. 400, p.194). This detailed 48-page inventory of the evidence that had been given to the defense is a matter of record before this court (Tr. 173-220).

2)      Evidence presented at the sentencing hearing.

The United States proved the murders of Escobar, Nieto, Sosa and Cantu, and Garza's participation in them through the testimony of accomplices Israel Flores, Jesus Flores and Greg Srader, all of whom actually participated in one or more of the murders. How each victim was identified and the autopsy results were proved at trial through the in-court testimony of the United States Customs agents who investigated the crimes and by the pathologist who actually conducted the autopsy. As stated above, Garza was given copies of Mexico's investigative reports and "certified" translations of the autopsy reports well in advance of trial. This evidence is detailed as follows:

a)      Murder of Fernando Escobar Garcia.

Escobar's murder was proved primarily through the testimony of Garza's accomplice, Israel Flores. Flores testified that Antonio Nieto was one of Garza's associates who had

participated in stalking Matos, and Fernando Escobar Garcia (who was one of Garza's Mexican contacts). On one of Flores and Nieto's trips to Mexico to buy marihuana for Garza, Nieto was arrested for possessing a gun and marihuana "joints." At the time of his arrest, Nieto was driving Escobar's car. Flores loaned Nieto $10,000 of Garza's drug money to get out of jail; however, Nieto reneged on his promise to repay the loan. Meanwhile, complaining that they were taking too long to complete the deal (they were in Mexico from January to May 1991), Garza called Flores and told him to return to Brownsville. Having spent the money on Nieto's arrest and another $10,000 of Garza's money "partying", Flores was afraid to return. As a result Garza traveled to Vera Cruz. Flores lied to him about what had happened to the money and told him that they had used the money to purchase marihuana; however, when Flores left to pick up Escobar, Nieto told Garza the truth. Garza struck Flores and made him tell the truth (R. 3038-43, 3072).

Garza responded initially that he was going to kill all three of them: Nieto and Flores for their actions; Escobar because he was an instigator (R. 3044). His second response, made in the presence of all three, was that he would let them work off their debt. Garza took all of them to a restaurant (R. 3044-45). There, Garza told Flores and Nieto privately that he was going to kill Escobar because he had no use for him (R. 3046-47, 3061-62, 3065). Afterwards, Garza and another person identified only as "Gil" drove the trio to a secluded area. While the car was moving, Garza shot Escobar three times and dragged his body in the sand dunes (R. 3047-48, 3062-65). They later dumped the car and returned to Brownsville (R. 3049).

It was later determined by United States and Mexican authorities that Escobar had been killed around May 5 - 7, 1991 (R. 3296). Agent Robert Garcia, who was in charge of the U.S.

7

Customs, Merida, Yucutan, Mexico, assisted in the investigation of Escobar's murder (R. 3295). He contacted Escobar's brother, confirmed that the person identified in the newspaper article was Escobar, that the brother had viewed Escobar's body in the morgue, and that he had been shot several times (R. 3296-97). On cross-examination, Agent Garcia testified that he learned of no other suspects during the course of his investigation in Mexico (R. 3300).

b)    Murder of Antonio Nieto

Israel Flores also testified as to Antonio Nieto's murder. Garza blamed Flores for losing the money and Escobar's death. About a week later, Garza ordered Flores to get rid of Nieto; if Flores refused, Garza threatened to kill both of them (R. 3050-51, 3060, 3073-75). Per Garza's instruction and plan, Flores and Raul Amaro told Nieto that they were going to stay at Amaro's grandmother's house in Matamoros instead of Juan's Villa Pancho ranch. They then drove Nieto to a secluded country road around Matamoros and Flores shot him four times, two of which were to the head (R. 3051-53, 3076-77). They reported the events to Garza (R. 3054-55, 3152). Jesus Flores testified that Garza told him that Israel had killed Nieto because "Nieto had wasted [Garza's] money over there in Mexico" (R. 3152-53).

United States Customs Special Agent Robert Pineda testified that he investigated the Nieto murder in Mexico in the fall of 1992 after receiving information that Garza may have been involved (R. 3304, 3306-07, 3324). At the time he arrived, Nieto's body had been found by the Mexican authorities but had been unidentified for 1½ years and treated as an unsolved murder (R. 3306-07). Agent Pineda obtained the Mexican police reports (R. 3328), and matched the case to Nieto based on the shots (R. 3307). He also met with Nieto's parents, who told him that Nieto had been missing for about 1½ years. Nieto's father identified his son by photographs taken when

-13-

8

the body was discovered.  In particular, he identified the tattoos on Nieto's skin (R. 3308, 3329; G.Exh. 192 [autopsy report ]; G.Exh. 193 [translation]).  The photographs of the crime scene, the body, and a key ring found on the body that Nieto's father used to identify his son were introduced into evidence as G.Exh. 195, 198, and 603 (R. 3310-12, 3327-28).

Nieto's body was exhumed from its Mexican grave transported to the United States (R. 3309).  Agent Pineda personally viewed the body (R. 3325).  The funeral director, Dr. Ramirez, specifically remembered burying that particular body in Mexico as an unidentified body (R. 3309).

Dr. Marguerite DeWitt, the pathologist who performed the autopsy on Nieto's body in the United States, testified at trial and was cross-examined by counsel for Garza (R. 3079).  Her report, G.Exh. 372, was not introduced into evidence based on Garza's objection that the witness "can testify to the material on here." (R. 3082).

DeWitt testified on questioning by the court that she had been informed by Detective Rolando Vasquez of the  Brownsville  Police Department (R. 3083, 3091) that Nieto had probably died in Brownsville and was then buried in across the border in Matamoros, Mexico (R. 3084).  An x-ray of the body revealed two gunshot wounds to the head.  Bullet fragments were removed from the head and from the left side of the torso (R. 3086-89, 3093).  Because the body soft tissue was in an advance stated of decomposition, the pathologists was unable to determine whether there were additional shots to the soft tissue (R. 3090, 3096).

Garza elicited on cross-examination the name of the detective to whom the pathologist spoke in the Brownsville Police Department (R. 3091).  On further questioning, DeWitt testified that she had not seen any Mexican autopsy report and did not know whether Mexican authorities even performed an autopsy (R. 3092).  She testified that there were no exit wounds, indicating

that the bullets stayed in the head (R. 3094). To counsel's questioning whether there was "not enough force" for the bullet to exit, DeWitt explained that it was common for the bone and brain matter to absorb the force of the firing (R. 3094).

c)    Murder of Bernabe Sosa.

According to Israel Flores, Garza did not like his son-in-law Bernabe Sosa because he had once brought a gun to Garza's house (R. 3055-56). According to Jesus Flores, Garza also blamed Sosa for the January 1992 seizure in Houston (R. 3159-60). Sosa was apparently taken into custody with the seizure but was released when two others apprehended were detained (R. 3159-60). Garza told Jesus Flores that something was fishy and accused Sosa of trying to set him up (R . 3160). A couple of weeks later, Garza told Jesus Flores that he wanted Sosa killed (R. 3161). In the presence of co-conspirators Jesus Flores, Emilio ("Biggie") Gonzalez and Raul Amaro, Garza stated his plan was to take Sosa to Matamoros under the pretext of looking at a landing strip and to kill him there (R. 3162).

Garza instructed Jesus Flores to wait for him at Gonzalez' house (R. 3163). In accordance with Garza's plan, Garza contacted Sosa and had Amaro drive across the border. Garza instructed Jesus Flores to cross the Gateway International Bridge on foot and Emilio Gonzales to drive across. Once on the Mexican side, Flores and Gonzales drove to the old bridge. There, per Garza's instruction and plan, Sosa and the other three got out of the car and started walking toward the supposed landing strip. On Flores' prearranged cue, Gonzalez shot Sosa first with a gun supplied by Garza. (Jesus Flores testified that he saw Garza give Gonzalez the gun). Gonzales' gun then jammed and Amaro shot Sosa two more times (R. 3164-68). Flores testified that he believed Sosa was shot in the head (R. 3168). Still following Garza's instruction,

-15-

Gonzales then handcuffed Sosa to give the appearance that the Mexican Federales had murdered Sosa (R. 3161-69). The assailants then met Garza at a place called the "Toucan Lounge" and told him what had happened (R. 3169). Jesus Flores testified that he participated in this murder to pay Garza back $14,000 that he owed him and to keep from being one of Garza's victims (R. 3169-70).

Dr. Eduardo Lopez-Vasquez, a forensic pathologist in the city of Rio Bravo, Tamulipas, testified for the government that he performed an autopsy on Sosa's body in January 1992 (R. 3245; G.Exh. 234 (autopsy report); G.Exh. 235 (translation)). Sosa's body had three gunshot wounds to the head and neck and powder burns (R. 3246-49). The caliber of the gun used was not identified (R. 3250). The handcuffs were on Sosa when the body was subsequently recovered (R. 3250, 3313-16). Agent Pineda obtained photographs of the body and the recovery site from Mexico's files and they were introduced into evidence as G.Exh. 238, 240 (R. 3314-16, 3327).

### d)   Murder of Oscar Cantu.

Accomplice witnesses Israel Flores and Greg Srader testified as to Oscar Cantu's murder. Oscar Cantu was one of Garza's pilots who, at Garza's instruction, purchased marihuana and returned it to Matamoros (R. 3056, 3101, 3213). To make these purchases, Greg Srader would receive cash from Garza, take it to a bank in Mexico and wire the funds to Cantu in Vera Cruz (R. 3102-03, 3109). On one such venture in 1991, Cantu reported to Garza that he had been pulled over by the Mexican police, tortured and the $40,000 - $60,000 seized. Garza did not believe Cantu's story. He believed instead that Cantu had "ripped it off" and stated that he was going to kill him (R. 3056-58, 3066, 3104-05). Thereafter, Garza and Jesus Flores[3] took Cantu

---

[3]On examination by the court, Jesus Flores denied any knowledge as to what had happened to Cantu (28 R. 3213).

on a trip to Mexico. Cantu never returned (R. 3105, 3112). Srader testified that Garza admitted to him that they had killed Cantu (R. 3058, 3106, 3114-15).

Srader was cross-examined by the defense, who elicited testimony that Cantu was also a paid pilot for a drug trafficker named Medina (R. 3107). When pressed as to whether Cantu was working for Medina at the time of his murder, Srader remained firm that he was working for Garza but could not state with certainty that he wasn't also dealing with Medina (R. 3113-14). Srader confirmed that he had sent money to Cantu on several occasions at Garza's direction to wire transfer (R. 3107-09). Srader overheard and was part of the conversations between Garza and Cantu regarding the lost money. He confirmed that the money Cantu lost ("[p]robably around $40,000 or $60,000") belonged to Garza (R. 3109-11). Cantu had claimed that the Mexican Federales had tortured him by shocking him on his testicles. Srader testified on cross-examination that Cantu had showed him the scars (R. 3111, 3114-16). He remained unequivocal in his testimony that Garza had told him that he killed Cantu (R. 3114-16).

Dr. Lopez-Vasquez also performed an autopsy on Cantu's body in April 1991 (R. 3237). His report was identified at trial as G.Exh. 184, and admitted only as a trial aid (R. 3238-39). The translation was identified as G.Exh. 185 (R. 3239). Cantu had been shot once in the head at a range close enough to leave powder burns (R. 3240-43). The pathologist was not able to determine the caliber of the weapon that killed Cantu (R. 3243). Garza elicited on cross-examination Dr. Lopez did not personal knowledge as to the identity of the body; that he had been informed by the Mexican district attorney's office that relatives had identified it (R. 3253-54, 3259).

United States Customs Special Agent Robert Pineda also testified that he retrieved the Mexico records on the Cantu murder in Rio Bravo, Tamaulipas. He met with the Ministerio Publico, a woman named Loera. He determined that Mexican officials had an open file on the Cantu murder as an unsolved murder and photographs of the body at the site of its recovery from an irrigation canal (R. 3301-02, 3322). The Mexican District Attorney identified the body as Cantu (R. 3304). According to the information he received, Cantu had been shot and was found in an irrigation canal. Agent Pineda obtained the crime scene photographs, which were identified as G.Exh. 187-188.[4] He also visited the crime scene himself after the body was removed (R. 3302, 3323). At the time he was sent to Mexico, United States officials suspected that Garza had ordered the killings. Agent Pineda had been sent to Mexico to see if the bodies had been discovered (R. 3304).

### B.    Garza has failed to demonstrate any Due Process violation.

As the above evidence demonstrates, the United States turned over to the defense pretrial all investigative and police reports in its possession, including all reports obtained from the Mexican authorities. The United States additionally translated the Mexican autopsy reports for the defense. The United States agreed that it had a continuing obligation to turn over any *Brady* material that might come into its possession. There is no complaint before this court -- because none exists -- that the United States violated *Brady* by failing to turn over exculpatory evidence within its possession.

---

[4]G.Exh. 187, which identified the wounds on the body was not introduced into evidence (29 R. 3305). The court, however, did permit G.Exh. 188, which showed body at the recovery site (29 R. 3306)..

To the extent that Garza is arguing on collateral attack that the United States was obligated to conduct further discovery for the defense, his argument is meritless for several reasons. While under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), the prosecution must disclose exculpatory or impeachment evidence within its possession," the Supreme Court has unequivocally held that Brady does not create a general right to discovery in criminal cases. *Gray v. Netherland*, 518 U.S. 152, ___,116 S.Ct. 2074, 2084 (1996); *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837, 846 (1977). *Brady* does not require the government to pursue every possible avenue of investigation and to make the defendant's case for him. *United States v. Aubin*, 87 F.3d 141, 148 (5th Cir. 1996)(*Brady* does not require the prosecution "to conduct a defendant's investigation or to assist in the presentation of the defense's case."), *cert. denied,* 117 S.Ct. 965 (1997); *United States v. Wilson*, 116 F.3d 1066, 1082 (5th Cir. 1997)(a prosecutor has no duty under Brady to investigate the mental state of its witnesses in order to uncover impeachment evidence for the defense), *cert. denied*, 118 S.Ct. 704 (1998); *East v. Scott*, 55 F.3d 996, 1002 (5th Cir. 1995)(same). "The purpose of the *Brady* rule is to 'ensure that a miscarriage of justice does not occur, not to displace the adversary system as the primary means by which truth is uncovered.'" *Aubin*, 87 F.3d at 148-49 (citing *United States v. Johnson*, 872 F.2d 612, 619 (5th Cir.1989) (quoting *United States v. Bagley*, 473 U.S. 667, 675, 105 S.Ct. 3375, 3380 (1985).

While under *Kyles v. Whitley* the Supreme Court recognized that knowledge of evidence within the possession of government agents may be imputed to the prosecutor in his/her affirmative duty to disclose *Brady* material, 514 U.S. 419, 437, 115 S.Ct. 1555, 1567 (1995)("the individual prosecutor has a duty to learn of any favorable evidence known to the

-19-

others acting on the government's behalf in the case, including the police"), in this case there is absolutely no evidence or even allegation that in conducting their own investigations the Mexican authorities were acting on the United States' behalf in the case. Further, Garza makes no allegation and presents no proof that the Mexican authorities were *in fact* in possession of *any* exculpatory evidence that was not disclosed to him. Nor does he (or can he) claim that the government somehow misled the defense regarding the availability of otherwise readily obtainable *Brady* material. *Compare United States v. Senn*, 129 F.3d 886, 893 (7th Cir.1997). Rather, Garza agrees that the United States turned over all evidence obtained from the Mexican authorities within its possession and that it agreed to turn over any evidence that might come into its possession in the future. Assuming, *arguendo,* support for Garza's argument that the government has some affirmative duty to produce government informants residing in foreign countries, *see Garza's petition* at 12 (citing *Velarde-Villarreal v. United States*, 354 F.2d 9, 13 (9th Cir. 1965) and *United States v. Padilla*, 869 F.2d 372 (8th Cir. 1989)), those are not the facts of Garza's case. Those decisions are factually inapposite.

Garza concedes further that this court ordered him to identify with specificity any additional documents or records that he believed existed. *Garza's petition* at 10. He did not identify any such document or record before this court at trial. In fact, in this petition he does not identify with particularity *any* exculpatory or material evidence that would have been discovered by further investigation in Mexico. While he claims to have "heard allegations" that other individuals were arrested in connection with the murders, he never identifies those persons, what they would have testified to, or that they would have agreed to testify at all. He never identifies from whom he heard those unspecified "allegations", nor gives any facts whatsoever to

demonstrate the reliability of those "allegations". His suggestions that such evidence even exists are wholly speculative and self-serving. Consequently, his claim is wholly are wholly conclusory and insufficient to entitle him to collateral relief. *West v. Johnson*, 92 F.3d 1385, 1399 n. 19 (5th Cir. 1996)("there is absolutely no indication in the petition (or elsewhere in the record) of what the claimed 'evidence' is or consisted of or of how it might have been found."), *cert. denied*, 117 S.Ct. 1847 (1997). *Compare Mayo v. Collins*, 882 F.2d 134, 138 (5th Cir. 1989)("complaints of uncalled witnesses are not favored on federal habeas review because allegations of what a witness would have testified are largely speculative"); *Lockhart v. McCotter*, 782 F.2d 1275, 1282 (5th Cir.1986)(same); *United States v. Cockrell*, 720 F.2d 1423, 1427 (5th Cir.1983)("'[C]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy, and because allegations of what a witness would have testified are largely speculative.'"), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3534 (1984).

Further, the government has no obligation under *Brady* to point the defense toward potentially exculpatory evidence when that evidence can be discovered by exercising due diligence. *United States v. Mmahat*, 106 F.3d 89, 94 (5th Cir.1997), *cert. denied*, 118 S.Ct. 136 (1997); *United States v. Mulderig*, 120 F.3d 534, 540 (5th Cir. 1997)(when information is fully available to defendant at time of his trial and his only reason for not obtaining and presenting evidence to court is his lack of reasonable diligence, defendant has no *Brady* claim), *pet. cert. filed*, 66 U.S.L.W. 3364 (Nov. 12, 1997). This court ordered Garza to explain not only the evidence he was seeking but why he could not obtain such evidence with the exercise of due diligence. Garza makes no allegation and has presented no evidence that he ever even attempted any independent investigation in Mexico much less that he was in some way prohibited

from making such investigation. To the contrary, his position has consistently been that his "English speaking court appointed attorneys could not be expected to use their limited time and resources" to investigate "to find witnesses in Mexico who would voluntarily travel here to help [Garza]". *Garza's petition* at 14. This is contrary to the established law that he exercise due diligence.

Garza's claim that he was denied his right to compulsory process is also meritless. First, this court never denied any request to subpoena a witness that was identified by the defense. To the contrary, although specifically directed to do so, Garza never identified any witness in connection with the extraneous murders in Mexico that he wanted to testify on his behalf at sentencing. As Garza concedes in his petition, "[t]echnically speaking, there was no violation of his right to compulsory process." *Garza's petition* at 12. Second, Garza does not now identify any witness whose testimony he was unable to procure for his defense or who would have even been willing to testify on his behalf. The Sixth Amendment right to compulsory process is a guaranteed right but it is not absolute. When requesting a court to subpoena a witness, the defendant bears the burden of demonstrating the necessity for the testimony. *United States v. Gonzales,* 79 F.3d 413, 424 (5th Cir. 1996), *cert. denied,* 117 S.Ct. 183 (1996). At best, his allegations that potential defense witnesses existed are wholly conclusory and insufficient to state a claim for collateral relief.

Third, to the extent that Garza is claiming a constitutional right to extra-territorial subpoena power, his claim is contrary to the established law of this circuit. As the Fifth Circuit explained in rejecting a similar argument in *United States v. Zabaneh,* 837 F.2d 1249, 1259-60 (5th Cir. 1988):

7

It is well established, however, that convictions are not unconstitutional under the Sixth Amendment even though the United States courts lack power to subpoena witnesses, (other than American citizens) from foreign countries.

*See also United States v. Sensi*, 879 F.2d 888, 899 (D.C. Cir. 1989) ("It is well settled that a defendant's inability to subpoena foreign witnesses is not a bar to criminal prosecution."); *United States v. Theresius Filippi*, 918 F.2d 244, 247 (1st Cir. 1990) (the Government has no power to compel the presence at trial of a foreign national residing outside the United States and thus failure to issue a subpoena to foreign national did not violate the Sixth Amendment). Aside from the fact that there is no authority to issue such subpoenas, if Garza's argument were accepted then "any defendant could forestall trial simply by specifying that a certain person living where he could not be forced to come to this country was required as a witness in his favor." *United States v. Greco*, 298 F.2d 247, 251 (2d Cir. 1962).

Finally, Garza's argument that he was denied the opportunity to deny or explain the government's evidence against him at sentencing in violation of the Due Process Clause was answered against him by the Supreme Court in *Gray v. Netherland*, 116 S.Ct. at 2074. As explained by the Court, the defendant's death sentence in *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197 (1977) was based on evidence assembled in a confidential presentence report that the defendant had no opportunity to see, let alone contest. 116 S.Ct. at 2084. Unlike *Gardner*, and like *Gray*, Garza was given express notice of the extraneous offenses and the evidence that the government used against him at sentencing. He had the opportunity to hear the testimony of the witnesses in open court and to cross-examine them. 116 S.Ct. at 2084.

Further, the United States did not rely on any investigation conducted by the Mexican authorities to prove these murders. Thus, to the extent that Garza claims this "court could have

excluded evidence that the Mexican police gave to our government if he had evidence to prove that the Mexican authorities used investigatory methods that shock the conscience to obtain it" and that there are no "safeguards" to ensure the reliability of investigations conducted by the Mexican authorities, his argument has no factual foundation. *Garza's petition* at 15. The United States agents conducted their own investigations as to the identity of the bodies discovered and Garza's participation in murders, and those investigating officers in fact testified at trial. The corpus delicti for Escobar and Nieto were proved through independent investigation of United States agents. The autopsy on Nieto's body was conducted in the United States, completely independent of any Mexican autopsy. While the autopsies on Sosa and Cantu's body were done by a Mexican pathologists, Garza *in fact* was given the Mexican pathologist reports pretrial and Dr. Lopez testified at trial.

Garza's participation in the murders was proved by the testimony of his co-conspirators who actually participated in the murders and who unequivocally identified Garza as orchestrating them. The investigations leading to the discovery of these witnesses and their interrogations were conducted by agents of the United States and wholly independent of the Mexican authorities. Garza does not and has never disputed this fact.

Garza argues that it is improper to consider a foreign conviction at the sentencing phase of a capital trial if the rules of criminal procedure in that country are fundamentally unfair by American standards and unless the federal sentencing judge finds that the evidence is reliable in spite of the constitutional infirmity. *Garza's petition* at 17. This argument is specious as Garza's sentence was in no part premised on a foreign conviction.

-24-

## 8.    GARZA WAS NOT DENIED EFFECTIVE ASSISTANCE OF COUNSEL ON DIRECT APPEAL.

Garza's final claim is that he was denied effective assistance of counsel on appeal. This claim is premised on counsel's failure to fully brief an issue noted in footnote 41 of his brief. The Fifth Circuit found that "Garza provides nothing to support his bald assertions that because of these characteristics, the verdict form as a whole deprived Garza of due process of law." It found that his claims were not adequately briefed to merit considerations. *Id.*, at 1374, n. 36.

It is of course well settled that a criminal defendant is constitutionally entitled to the effective assistance of counsel on direct appeal as of right.    *Goodwin v. Johnson*, 132 F.3d 162, 170 (5th Cir. 1997).   To prevail on such a claim, Garza must meet the two prong standard of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984) by showing that his attorney's performance was deficient and that such deficiency prejudiced the defense. *Id.* at 687, 104 S.Ct. at 2064; *United States v. Patten*, 40 F.3d 774, 776 (5th Cir. 1994), *cert. denied*, 515 U.S. 1132, 115 S.Ct. 2558 (1995); *United States v. Merida*, 985 F.2d 198, 202 (5th Cir. 1993).

Garza does not demonstrate any deficiency on the part of appellate counsel's performance that resulted in prejudice.   Garza contends on collateral attack that the verdict form was "heavily weighted toward the death penalty" because the jury was told that consideration of non-statutory mitigating circumstances was permissible rather than mandatory.   He argues that the Eighth Amendment requires the court to instruct the jury on its obligation and authority to  consider mitigating evidence.  This argument was rejected by the Supreme Court in *Buchanan v. Angelone*, 118 S.Ct. 757, 761-62 (1998).

> [T]he State may shape and structure the jury's  consideration of mitigation so long as it does not preclude the jury from giving effect to any relevant mitigating evidence.  Our consistent concern has been that restrictions on the jury's sentencing

determination not preclude the jury from being able to give effect to mitigating evidence. . . . But we have never gone further and held that the state must affirmatively structure in a particular way the manner in which juries consider mitigating evidence. And indeed, our decisions suggest that complete jury discretion is constitutionally permissible.

(Internal citations omitted). Appellate counsel's performance was not constitutionally deficient for failing to brief a nonmeritorious legal claim.

Further, Garza's claim is factually nonmeritorious. As was stated on direct appeal challenges to the jury instructions are to be reviewed in the context of the court's charge as a whole and the surrounding context of the trial. *Flores*, 63 F.3d at 1374-75. This court instructed the jury at trial "[t]he law of the United States provides a list of some mitigating factors that you as jurors *must consider*." (Emphasis added) (30 R. 3578). This court carefully instructed the jury that the list was "not to be viewed as a complete list of the mitigating factors you may consider" and that the jurors were unlimited in the consideration of any circumstance or fact that "indicates or tends to indicate that the defendant should not be sentenced to death" (R. 3578). This court specifically directed the jury as to statutory factor 10, "which says that you may consider other factors in the background or character which mitigate against imposition of death," and to the 18 non-statutory mitigating factors that the defense specifically requested that the jury consider. In so doing, it again carefully instructed the jury, "always remember that you are not confined to what is alleged by law or what is alleged by the defendant to be a mitigating factor. You can consider anything as a mitigating factor", including factors not listed (R. 3578-79). Thus, the charge read in its entirety instructed the jury that it must consider the statutory mitigating factors while emphasizing that the jury was in no way limited in its consideration of any mitigating circumstances.

The written verdict form was in no way contrary to the court's instructions. Rather, the unambiguous language in paragraph 1 of the verdict form simply gave the jury the option of making a written finding as to each statutory mitigating factor. The sentence that Garza references on page 23 of his petition is a clause taken out of the context of the sentence in which it is written. The plain reading of this paragraph instructs the jury that regardless whether the jury made a written finding, such finding may be made by one or more juror and each juror could individually consider any mitigating factor in determining Garza's sentence irrespective of whether any other juror concurred.

Finally, assuming *arguendo* a trial error, the fact that a trial error may have entitled a defendant to reversal of his conviction on direct appeal does not automatically establish prejudice under *Strickland*. "The essence of an ineffective assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Goodwin*, 132 F.3d at 172 (citing *Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S.Ct. 2574, 2582 (1986)). Consequently, to establish prejudice as a result of an appellate counsel's failure to present the issue on direct appeal, Garza must still demonstrate that the trial error undermined the reliability of the result of the trial proceeding. *Id.*, at 173; *Patten*, 40 F.3d at 777 (5th Cir. 1994)(citing *Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838, 844(1993).

This he cannot demonstrate. The jury was charged on each of the ten statutory mitigating factors set forth in 21 U.S.C. § 848(m)(1-10), and *in fact* made express written findings (R. 458-68; 3446, 3449). In particular, the jury found that Garza's capacity to appreciate the wrongfulness of his conduct or to conform such conduct to the requirements of the law was not

significantly impaired (subsection (m)(1)); that his participation in the offense was not minor (subsection (m)(3)); that he could have reasonably foreseen the deaths of the victims (subsection (m)(4)); and, that he did not commit the offense under severe mental or emotional disturbance (subsection (m)(7)).   It also found in the affirmative that Garza was acting under unusual or substantial duress when he committed the offenses (subsection (m)(2)); that he was youthful (subsection (m)(5)); that other equally culpable defendants had not been punished by death (subsection (m)(8)); that the victims consented to the criminal conduct that resulted in their deaths (subsection (m)(9)); and, that Garza's criminal record was unknown (subsection (m)(6)) (2 R. 264).

Subsection (m)(10) requires consideration without limitation of any "other factors in the defendant's background or character mitigat[ing] against imposition of the death sentence." Under this finding, the court charged the jury as to 18 non-statutory mitigating factors, "*all of those that [the defense] ha[d] requested*"[5] (R. 3446, 3449).   The jury was expressly charged that it was not

_____

[5]These were:   (11) JUAN RAUL GARZA'S mental and/or emotional disturbances were caused in part by the emotional instability of his family members during his early development stages; (12) JUAN RAUL GARZA never developed the ability to cope with daily tensions; (13) JUAN RAUL GARZA endured harsh and impoverished living conditions at home during developmental stage; (14) JUAN RAUL GARZA's childhood was very difficult and demanding in both a physical and emotional nature; (15) JUAN RAUL GARZA was deprived of a stable home environment due to constant relocation; (16) By the age of 10 years JUAN RAUL GARZA was forced to earn his own money to buy items of both necessity and survival; (17) JUAN RAUL GARZA was never able to develop a father-son relationship with his father; (18) JUAN RAUL GARZA was never able to show his emotional feelings or emotions due to conditions at home during his developmental years; (19) JUAN RAUL GARZA values life and was emotionally distraught over losing his mother to a disabling disease; (20) JUAN RAUL GARZA was deprived of a normal and stable education and withdrawn from school by his father; (21) JUAN RAUL GARZA showed initiative and desire to fulfill requirement to earn his G.E.D.; (22) JUAN RAUL GARZA's neighborhood environment was one conducive to exposure of illegal methods of obtaining money and misuse and/or abuse of illegal drugs; (23) JUAN RAUL GARZA was primarily responsible for the emotional and physical support of his invalid mother; (24) The wife and two young children of JUAN RAUL GARZA face the emotional trauma of losing his physical and mental support; (25) JUAN RAUL GARZA has two

-28-

limited to consideration of these 18 non-statutory mitigating factors when making the required subsection (m)(10) findings (R. 264, 3571, 3578-79). The jury answered the subsection (m)(10) inquiry in the affirmative, expressly finding without specifying which that at least one of these factors or "any another mitigating factors" existed (2 R. 267). The express written findings demonstrate that the jury *in fact* did consider both the statutory and non-statutory mitigating factors in determining Garza's sentence. *Compare Angelone*, 118 S.Ct. at 762 ("The standard for determining whether jury instructions satisfy these principles was "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." ) As Garza demonstrates no trial error that undermined the reliability of his trial or sentencing, prejudice has not been demonstrated.

For these reasons, Garza's motion to vacate sentence under 28 U.S.C. § 2255 and FED. R. CRIM. P. 33 should be denied in their entirety.

<div style="margin-left: 45%;">

Respectfully submitted,

JAMES H. DEATLEY
United States Attorney

PAULA C. OFFENHAUSER
Assistant United States Attorney
910 Travis, Suite 1500
P. O. Box 61129
Houston, Texas 77208-1129
(713) 567-9102

</div>

---

children, ages 2 and 4, who face growing up without a father to provide for them; (26) JUAN RAUL GARZA values his children responsibility and Christian values and has personally introduced them into a religious teaching environment; (27) JUAN RAUL GARZA has established and provided a well rounded relationship with his son and daughter; (28) JUAN RAUL GARZA has established a reputation in the business of home construction in the community.

## CERTIFICATE OF SERVICE

I, Paula C. Offenhauser, Assistant United States Attorney, certify that a copy of this answer, motion to deny relief and supporting brief has been served by placing it in the United States mail, postage prepaid, on April 8, 1998, addressed to:

PAULA C. OFFENHAUSER
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

UNITED STATES OF AMERICA           §
          Plaintiff-Respondent
                              §   CRIMINAL NO.   B-93-009
                              §
vs.                              §
                              §
JUAN RAUL GARZA,                    §
          Defendant-Movant §
(CIVIL ACTION NO.   B-97- _____ )   §

ORDER

It is **ORDERED** that **United States' Answer, Motion to Deny Relief Under Rule 8(A), 27 U.S.C. Foll. § 2255, And Supporting Brief** is hereby GRANTED.

SIGNED this _____ day of _____ 1998, at Brownsville, Texas.

_____
UNITED STATES DISTRICT JUDGE

6