*19*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JUN 0 5 2000

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | DOCKET NO. B-97-273 |
| vs. | § | |
| | § | |
| JUAN RAUL GARZA, | § | |
| | § | |
| Defendant-Movant, | § | |
| | § | |

## DEFENDANT'S MOTION TO RECONSIDER ORDER
## SETTING EXECUTION DATE

Defendant Juan Raul Garza asks this Court to reconsider its order scheduling his execution for August 5, 2000. Because the Court did not hold a hearing before exercising its date-setting authority – as the Court stated it would if the Government did not demonstrate good cause for its failure to set an execution date[1] – the Court did not have the opportunity to consider several factors cautioning against the setting of a date at this time. Specifically, Mr. Garza sets out four reasons why the Court should refrain from exercising its date-setting authority: (1) An administrative appeal under the Freedom of Information Act is pending with the Department of

_____

[1] "The Court now inquires if a date and time has been designated for the execution of the judgment entered in this case. Absent a showing of good cause within the next 10 days, hearing will be had to determine why the Court should not exercise its authority pursuant to 28 C.F.R. § 26.3." Order of Inquiry at 1, United States v. Garza, No. B-97-273 (S.D. Tex. May 11, 2000) (emphasis added).

1

Justice regarding documents essential to counsel's preparation of the clemency petition; (2) the

Department of Justice is conducting an historical study into potential racial disparities in the

federal death penalty authorization process; (3) a favorable decision by the United States Supreme

Court in a death penalty case, expected later this term, would have a direct impact on Mr. Garza's

case; and (4) the Inter-American Commission on Human Rights has asked the United States

Government not to execute Mr. Garza pending its review of an international law complaint filed

on his behalf.[2] Mr. Garza urges this Court not to set an execution date until these matters are

resolved, so that he will have a meaningful opportunity to present an application for executive

clemency containing all the information that the President of the United States will need to make

---

[2] Finally, counsel begs the Court to reconsider the difficulty he faces in attempting to represent two inmates now scheduled for execution less than three weeks apart. The Court declined to take this factor into account in its order setting the execution date: "The Court defers to the Defendant's Motion to Vacate Execution Date and respectfully reminds very competent Counsel that there was relief requested in pursuance of Executive Clemency as early as December, 1999." Order Setting Execution Date at 2. Counsel has filed no such request for executive clemency. However, counsel did file some preliminary motions for authorization of funds, in December 1999 and January 2000, so that he could formally begin the herculean task of preparing a clemency petition for the first federal inmate facing execution in thirty-seven years. See Ex Parte Motion for Authorization of Funds to Hire Video Production Service to Assist in Preparing Application for Executive Clemency (filed Dec. 20, 1999); Ex Parte Motion to Obtain Airline Tickets at Government Rates through National Travel Service (filed Jan. 12, 2000). The filing of these motions constituted the initiation, not the termination, of counsel's professional and statutory duty to represent Mr. Garza throughout "proceedings for executive or other clemency as may be available to the defendant." 21 U.S.C. § 848(q)(8) (West 1999) (emphasis added); see Hill v. Lockhart, 992 F.2d 801, 803 (8th Cir. 1993) (holding that "[t]he plain language of § 848(q) evidences a congressional intent to ensure that indigent state prisoners receive 'reasonably necessary' . . . clemency services from appointed, compensated counsel"); Strickler v. Greene, 57 F. Supp.2d 313, 317 (E.D. Va. 1999) (holding that Section 848(q)(8) entitles an indigent death row inmate to compensated counsel during clemency proceedings). Because counsel continues to devote an enormous amount of time to preparing the clemency petition, the scheduling of Mr. Garza's execution date on August 5, 2000, will interfere with and substantially prejudice counsel's ability to diligently represent David Gibbs, another death row inmate scheduled for execution on August 23, 2000.

2

his decision.

1.   **An administrative appeal under the Freedom of Information Act is pending with the Department of Justice.**

The elaborate procedures that the Department of Justice currently uses for deciding whether to seek the death penalty in a particular case were not in place at the time Mr. Garza was indicted in 1993. Since January 1995, when United States Attorney General Janet Reno implemented the death penalty authorization protocols, she has refused to seek the death penalty in over two-thirds of the cases she has reviewed. See Rory K. Little, The Federal Death Penalty: History and Some Thoughts about the Department of Justice's Role, 26 FORDHAM URBAN L.J. 347, 429 (1999) (compiling statistics that show that Attorney General Reno has refused to authorize for capital prosecution 272 out of 374 potential death penalty cases (72.7%) that she has reviewed since 1995). The absence of these protocols at the time of Mr. Garza's case raises serious concerns about the consistency of the Government's decision-making process to pursue capital punishment in potential death penalty cases, especially considering that some drug trafficking cases involving multiple murders were not authorized for capital prosecution.

In 1994, Ms. Reno stated that the Department of Justice would create "an appropriate mechanism for post-trial disclosure of the Department's capital prosecution decisions, so that the public can review and understand the basis for such decisions." Ex. 1 (emphasis added). She said that such a mechanism would be in place before the effective date of the 1994 Crime Bill expanding the federal death penalty. Id. Six years later, the Justice Department has not disclosed its capital prosecution decisions to the public. Without the information the Department of Justice has failed to make public, a comparison of Mr. Garza's case with others in which the death

3

penalty was not authorized is impossible.

On December 21, 1999, counsel for Mr. Garza made a request pursuant to the Freedom of Information Act ("FOIA") to obtain this information. Ex. 2. Counsel asked for copies of all Department of Justice Capital Case Review Committee memoranda, from January 1995 to the present, setting out the Committee's recommendations about whether to authorize a death penalty prosecution in death-eligible cases involving federal crimes. Id. Due to the nature of the case, the Department of Justice granted counsel's request for expedited consideration. Ex. 3.

In late March 2000, the Department of Justice denied counsel's requests for the Capital Case Review Committee's written recommendations. Ex. 4. Counsel timely filed an administrative appeal. Ex. 5. The administrative appeal is currently pending with the Department of Justice. The requested information is critical to the preparation of Mr. Garza's clemency petition. However, counsel cannot initiate a FOIA lawsuit in federal district court until the Department of Justice rules on the administrative appeal. 28 C.F.R. § 16.9(c).

2.    **The Department of Justice is conducting a study into potential racial disparities in the federal death penalty authorization process.**

On February 10, 2000, Deputy United States Attorney General Eric Holder announced that Attorney General Janet Reno had ordered him "to study whether inappropriate racial disparities exist in the federal death penalty system." James Vicini, U.S. Official to Study Death Penalty Racial Bias, REUTERS, Feb. 10, 2000 (Ex. 6). Mr. Holder said that the Department of Justice "want[s] to make sure that the system is as fair as it can be, and we are always looking for ways to improve the system." Id.

The statistical information currently available to the public confirms that race plays an

4

unacceptable role in determining who is selected for federal death penalty prosecution.  A 1994 staff report by the House Subcommittee on Civil and Constitutional Rights found that, in cases where the Government decided to seek capital punishment, 89% of the defendants were either African-American or Latino.  Ex. 7.  More recent statistics show little improvement.  Of the 133 defendants authorized for death penalty prosecution from 1988 to 1998, 76% were members of racial minorities.  Little, supra, at 480.

Less than a month after Mr. Holder's announcement, counsel for Mr. Garza wrote to Attorney General Reno in an attempt to informally obtain the raw racial statistics under review by the Department of Justice.  Ex. 8.  After receiving no response, counsel filed a formal FOIA request for the statistical information.  Ex. 9.  The Department of Justice is currently reviewing the request.

**3.      A favorable decision by the Supreme Court in Ramdass v. Angelone would have a direct impact on Mr. Garza's case.**

On January 7, 2000, the United States Supreme Court granted review in Ramdass v. Angelone, 187 F.3d 396 (4th Cir. 1999), cert. granted, 120 S.Ct. 784 (Jan. 7, 2000).  The relevant portion of the question presented reads:

> Simmons v. South Carolina [512 U.S. 154 (1994)] holds that when a prosecutor seeks the death sentence on the ground of the defendant's future dangerousness, the defendant has a constitutional right to inform the jurors truthfully that if they spare his life, state law forbids him ever to be released from prison.  Does the rule in Simmons turn on the actual operation of state law, or on its hypertechnical terms?

Ramdass argued that, because he was ineligible for parole under Virginia's "three-strikes" statute, he was entitled to give the jury in his capital murder trial a Simmons instruction.  Ramdass, 187 F.3d at 401.  The United States Court of Appeals for the Fourth Circuit noted that

5

Ramdass was technically eligible for parole, because a judgment had not been formally entered on his third felony conviction at the time of his capital murder trial. Id. at 404. As a result, the Court of Appeals held that Ramdass was not entitled to a Simmons instruction. Id. at 405-08.

In Mr. Garza's case, the same "hypertechnical" interpretation of parole eligibility prevented the trial court from giving an instruction that Mr. Garza would be sentenced to life without the possibility of parole if the jury did not sentence him to death. United States v. Flores and Garza, 63 F.3d 1342, 1367-69 (5th Cir. 1995). The Fifth Circuit found no Simmons violation, because, technically, Mr. Garza was eligible for a downward departure under the Sentencing Guidelines. However, the Fifth Circuit noted the dangers of adopting a highly technical definition of parole eligibility:

> This does not mean that district courts should allow the government to freely hammer away on the theme that the defendant could some day get out of prison if that eventuality is legally possible but actually improbable. By this point in any penalty hearing, the judge will have heard the same evidence as the jury and will ordinarily know whether he would consider a downward departure if the jury declines to recommend death. If the court knows that a twenty-year sentence is highly unlikely, it should, in its discretion, preclude the government from arguing that the defendant may be free to murder again two decades hence.

Id. at 1368-69 (emphasis added).

If the Ramdass decision by the Supreme Court later this term is favorable, Mr. Garza will attempt to re-open his appeal and seek a new sentencing hearing. He anticipates that the Government will vigorously challenge any efforts to bring the Ramdass claim to the courts' attention. If his efforts for legal relief are unsuccessful, then Mr. Garza's only opportunity to pursue this issue will be in his application for executive clemency.

6

4.      **The Inter-American Commission on Human Rights has asked the United States Government not to execute Mr. Garza while his complaint is under review.**

On December 14, 1999, less than one month after the Supreme Court's denial of review of Mr. Garza's petition for writ of certiorari, lawyers working with his habeas counsel lodged a complaint with the Inter-American Commission on Human Rights ("the Commission"). Ex. 10.[3] The complaint alleges a violation of Mr. Garza's rights under Articles I, XVIII, and XXVI of the American Declaration of the Rights and Duties of Man.[4] The Commission notified the United States Government of the complaint and asked "that the United States of America take all necessary steps to preserve Mr Garza's life and physical integrity so as not to hinder the processing of the case before the Inter-American system." Ex. 11.[5] The Government has failed to respond to the complaint, despite a requirement contained in the Regulations of the Commission that it respond within ninety days.[6] On May 5, 2000, the Commission issued a second note asking

_____

[3] A complaint could not be lodged with the Commission before the Supreme Court's denial of review. Article 37 of the Regulations of the Inter-American Commission on Human Rights provides that domestic remedies must be exhausted before any complaint is lodged.

[4] These Articles protect the right to life, the right to a fair trial, and the right to due process of law. The complaint alleges that these rights were violated when the Government, at the sentencing phase of the trial, introduced evidence that Mr. Garza had committed four additional murders in Mexico for which he was never arrested, prosecuted, convicted, or sentenced. No state or federal death sentence in the history of the modern era of capital punishment – since 1976, when the death penalty was reinstated – has relied upon offenses from a foreign country for which the defendant was never convicted.

[5] Article 29(2) of the Regulations provides that: "In urgent cases, when it becomes necessary to avoid irreparable damage to persons, the Commission may request that provisional measures be taken to avoid irreparable damage in cases where the denounced facts are true."

[6] Article 34(5) of the Regulations provides that: "The Commission shall request the affected government to provide the information requested within 90 days after the date on which the request is sent." Article 34(6) of the Regulations provides that: "The government of the State

the Government to respond to the complaint. Ex. 12. Finally, on May 31, 2000, after counsel notified the Commission that an execution date had been set for Mr. Garza, the Commission promptly "reiterated its call [to the United States Government] for an urgent response to its request for precautionary measures." Ex. 12.

The United States is a member of the Organization of American States ("the OAS"). It was a party to the Ninth International Conference of American States, in 1948, which adopted the Charter of the Organization of American States. The same Conference also adopted the American Declaration of the Rights and Duties of Man. In 1959, a resolution of the Fifth Meeting of Consultation of Ministers of Foreign Affairs created the Commission. The functions and powers of the Commission were expanded in 1965 by a resolution passed at the Second Special Inter-American Conference. This resolution expanded the Commission's functions and powers by requiring it to "give particular attention in this survey to the observance of the human rights referred to in Articles I, . . . XVIII, . . . and XXVI of the American Declaration of the Rights and Duties of Man" and authorizing it "to examine communications submitted to it and any other available information, to address to the government of any American State a request for information deemed pertinent by the Commission, and to make recommendations, when it deems this appropriate, with the objective of bringing about more effective observance of fundamental human rights. See Final Act of the Second Conference, OAS Official Records, OEA/Ser.C/I.13, 1965, at 32-34.

---

in question may, with justifiable cause, request a 30 day extension, but in no case shall extensions be granted for more than 180 days after the date on which the first communication is sent to the government of the State concerned." The United States Government has made no request for an extension.

The United States Government has recognized the importance of the Commission and places significant weight on the role of the Commission in the protection of human rights.[7] In submissions to the Commission, the Government has not argued that the human rights standards protected by the American Declaration of the Rights and Duties of Man should not be respected by the United States or that the Commission should not promote those standards by interpreting the Declaration. For example, the Government has "argued that under the Charter of the OAS, the Commission has, of course, the competence and responsibility to promote observance of and respect for the standards and principles set forth in the Declaration. The United States has consistently displayed its respect for and support of the Commission in this regard, inter alia by responding to petitions presented against it on the basis of the Charter and the Declaration." Andrews v United States, Resolution No. 57/96.

Mr. Garza asks the Court to refrain from setting his execution date until either the Commission withdraws its request for precautionary measures, pursuant to Article 29(2) of the Regulations of the Commission, or the Commission decides the complaint. A resolution of the complaint in Mr. Garza's favor will benefit him in two ways. First, it will suggest that his execution is unlawful, because the human rights standards protected by the American Declaration of the Rights and Duties of Man should be regarded as consistent with the rights contained in the United States Constitution. Cf. United States v Duarte-Acero, 208 F.3d 1282, 1284-85 (11th Cir. 2000) (holding that the International Covenant on Civil and Political Rights is "coexistent" with

---

[7] The United States Department of State background notes on the OAS states that: "The [Commission] gives the OAS an active and, at times, forceful role in promoting and protecting human rights. Through private persuasion and published reports on human rights infringements, the [Commission] has been instrumental in improving OAS members' human rights practices and has helped to resolve conflicts."

9

the United States Constitution, and recognizing the persuasive value of the United Nations Human Rights Committee's interpretation of the ICCPR's provisions). Second, any final decision of the Commission will clearly be an important matter for the President to consider as part of his clemency decision. As noted, the United States has repeatedly recognized the important role that the Commission plays in the protection of human rights. Consequently, it would be particularly unjust to execute Mr. Garza before the Commission makes its decision, because much of the delay that has occurred can be attributed to the Government's failure to respond to the complaint, in direct violation of the Regulations of the Commission.[8]

## CONCLUSION

Since November 15, 1999, the date the Supreme Court denied Mr. Garza's petition for writ of certiorari, counsel has been working diligently on the application for executive clemency. It is, without exaggeration, an enormous and daunting task. Counsel is pursuing every available option that could potentially persuade the President to commute Mr. Garza's sentence to life in prison without the possibility of release. Counsel has not been dilatory in his efforts to obtain documents essential to the clemency petition. Accordingly, Mr. Garza asks that the Court vacate the currently scheduled execution date of August 5, 2000, and refrain from setting a new date until: (1) the FOIA litigation is completed; (2) the Department of Justice has concluded its study

---

[8] On April 13, 2000, the European Parliament passed a resolution "urg[ing] the U.S. Government to comply with the request made by the Inter-American Commission on Human Rights on 27 January 2000 that the execution [of Juan Raul Garza] should not proceed before the Commission has examined and ruled on the case." Human Rights: Death Penalty in the United States, EP Res. B5-0341, 0354, 0359, 0370, and 0376/2000 (13 Apr. 2000) (Ex. 14). The European Parliament is composed of citizens directly elected from each of the fifteen nations comprising the European Union.

10

of racial disparities in the federal death penalty authorization process; (3) the Supreme Court has issued its decision in <u>Ramdass v. Angelone</u>; and (4) the Inter-American Commission on Human Rights has decided Mr. Garza's human rights complaint.

Respectfully submitted,

*Greg Wiercioch*

Gregory W. Wiercioch
Texas Defender Service
412 Main Street, Suite 1150
Houston, Texas 77002
TEL (713) 222-7788
FAX (713) 222-0260

Counsel for Juan Raul Garza

## CERTIFICATE OF SERVICE

I, Gregory W. Wiercioch, hereby certify that a true and correct copy of Defendant's Motion to Reconsider Order Setting Execution Date was served on counsel for the Government on this 2nd day of June 2000, via First Class United States Mail, addressed to:

Paula Offenhauser
Assistant United States Attorney
P.O. Box 61129
Houston, Texas 77208-1129

*Greg Wiercioch*

11



Office of the Attorney General

Washington, D. C. 20530

August 17, 1994

The Honorable Cleo Fields
United States House of Representatives
Washington, DC 20515

Dear Congressman Fields:

I appreciated the opportunity to speak with you concerning the Crime Bill. I respect your deep and principled concerns regarding some of the measures in the Crime Bill and your opposition to capital punishment in all cases. As I told you, the Administration is committed to passing a balanced crime bill and to insuring that the stiff penalties it imposes are enforced in a fair and evenhanded manner, free from any racial, ethnic or other invidious discrimination.

The Administration is working, as am I personally, to insure that there will be absolutely no bias in our ongoing administration of capital punishment. To that end, the Department of Justice has been developing its internal procedures which govern our seeking of the death penalty. These procedures will be in place prior to the effective date of the Crime Bill and will cover the following areas, among others:

(1) Promulgation of internal procedures to insure that decisions to seek the death penalty are made in a uniform, fair, and non-discriminatory manner, so that defendants who commit similar acts and who have similar degrees of culpability are treated similarly by the Department;

(2) Adoption of an internal review mechanisms which will insure that those guidelines and procedures are complied with and that evidence of discrimination is reviewed by senior Department officials;

(3) Creation of an appropriate mechanism for post-trial disclosure of the Department's capital prosecution decisions, so that the public can review and understand the basis for such decisions; and

(4) Development of improved training and support for prosecutors who seek the death penalty, to insure that their actions will be consistent with Departmental policies, and adequate briefings to insure that they are familiar with our policies.

We will also be taking analogous steps to insure fairness in the administration of other aspects of the criminal justice system, with particular attention to the other enhanced penalties in the Crime Bill including the "three strikes" provision.

I believe that there is no tension between rigorous enforcement of the law and fair application of those laws. Fairness means freedom from discrimination, not freedom from appropriate punishment -- it means that victims from all background and all races see their victimizers punished to the full extent proper under the law.

In addition to our effort to insure fairness, the Administration is committed to making the promise of a balanced Crime Bill a reality. To achieve that end, we will fight to insure that the programs authorized in the bill to receive funding from the Violent Crime Reduction Trust Fund are in fact funded. It is imperative that the promises of more police on our streets, prisons space for violent offenders, and prevention programs to give young people something to say yes to are not turned into empty rhetoric.

Again, I enjoyed the opportunity to discuss with you these important matters and I hope that this letter has addressed any of your remaining concerns. I look forward to continuing to work with you this, and other, matters of mutual concern.

Sincerely,

Janet Reno

EXECUTIVE DIRECTOR
JIM MARCUS

STAFF ATTORNEYS
BRYCE BENJET
ELIZABETH DETWEILER
ANDREW HAMMEL
GREGORY W. WIERCIOCH

LEGAL ASSISTANT
ARACELI G. SEPULVEDA

PARALEGAL
MICHAEL HEATH

OF COUNSEL
RICHARD H. BURR, JR.
MANDY WELCH

BOARD OF DIRECTORS
MIKE CHARLTON, CHAIRMAN
JOHN E. ACKERMAN
ALLAN K. BUTCHER
DAVID R. DOW
JAN E. HEMPHILL
ROBERT MORROW
PROF. JEFF POKORAK
MARSHA RUTENBAR

# TEXAS DEFENDER SERVICE

412 MAIN, SUITE 1150, HOUSTON, TEXAS 77002
VOICE: (713) 222-7788 | FAX: (713) 222-0260

Tuesday, December 21, 1999

Nelson D. Hermilla
Chief FOIA/PA Branch
Civil Rights Division
Administrative Management Section
U.S. Department of Justice
P.O. Box 65310
Washington, D.C. 20035-5310

**VIA CERTIFIED MAIL**

Re:    Department of Justice Capital Case Review Committee Recommendations

Dear Mr. Hermilla:

This is a request under the Freedom of Information Act as amended in 5 U.S.C. § 552 in conjunction with the Privacy Act, 5 U.S.C. § 552a. I am writing to obtain copies of all Department of Justice Capital Case Review Committee memoranda, from January 1995 to the present, setting out its recommendations about whether to authorize a death penalty prosecution in death-eligible cases involving federal crimes.

I realize that your receipt of a large number of FOIPA requests may cause a delay in processing my request. However, I ask that you give my request expedited consideration. The records I am seeking are related to my representation of federal death row inmate Juan Raul Garza. Mr. Garza has exhausted his appeals and is on the brink of becoming the first federal prisoner to be executed since 1963. The information I have requested is critical to the application for executive clemency to President Clinton that I will be filing on Mr. Garza's behalf. Some courts have recognized that FOIA requests from death row inmates facing serious execution dates should be entitled to expedited handling. See, e.g., Cleaver v. Kelley, 427 F. Supp. 80, 81 (D.D.C. 1976); Morrow v. FBI, 2 F.3d 642, 645 (5th Cir. 1993)

(Wiener, J., concurring).

This request specifically includes "main" files, including but not limited to numbered and lettered subfiles and "DO NOT FILE" files. I wish to be sent copies of "see reference" cards, file covers, multiple copies of the same documents if they appear in a file, IA envelopes, enclosures behind file (EBF's) and bulky exhibits. I also request a search of the ELSUR Index. I am expressly incorporating the attached "Instructions" in this request.

As you know, the amended FOIA requires you to reduce or waive search and/or copying fees when release of the requested information would be "in the public interest." I believe that this request fits that category, and therefore I ask that you waive such fees. If you rule otherwise, and if the fees will exceed $50.00, please inform me of the charge before you fill this request.

Finally, please note my appreciation in your conducting this review in a manner consistent with Justice Department policy statements that:

> urged 'all federal departments and agencies to renew their commitment to the Freedom of Information Act, to its underlying principles of government openness, and to its sound administration.'

> [This statement has resulted in Attorney General Reno's decision to] rescind[ ] a 1981 Reagan administration policy on the defense of agency actions in FOIA litigation . . . [ordering that the Justice Department] no longer defend an agency's decision to withhold information merely because there is a 'substantial legal basis' for doing so. Instead, Reno said, in deciding whether to defend a non-disclosure decision, the department will apply a presumption of disclosure.

Administration Tells Agencies to Tilt Toward FOIA Disclosure, 62 USLW 2246 (Oct. 26, 1993).

If you have any questions concerning this request, please call me. I will expect to receive a reply within ten working days, as provided by the Freedom of Information Act. I appreciate your prompt attention to this important matter.

Sincerely,

Greg W. Wiercioch

Gregory W. Wiercioch

**Freedom of Information Act/Privacy Act**

Inquiry regarding:   DEPARTMENT OF JUSTICE CAPITAL CASE REVIEW
COMMITTEE RECOMMENDATIONS

<u>INSTRUCTIONS</u>

I hereby incorporate the following instructions in my FOIA/PA request letter:

1.   "MISSING" FILES:  Please place any "missing" files pertaining to this request on "Special Locate" and advise me that you have done this.

2.   "DUPLICATE" RECORDS:  I wish to make it clear that I want <u>all</u> records in your office "identifiable with my request," even though reports on these records have been sent to Headquarters and even though there may be duplications between the two sets of files. I do not want just "interim" documents.  I want all documents as they appear in the "main" files and "see references" of all units of your agency.  Further I request that all records be produced with the administrative pages.

3.   DENIAL OF REQUEST: If any part of my request is denied, please list the specific exemption(s) which is (are) being claimed to withhold information for each passage or whole document.

   a.   PARTIAL DISCLOSURE OF DOCUMENT:  If you determine that some portions of the requested materials are exempt, I will expect, as the Act provides, that you will provide me with remaining, non-exempt portions.

   b.   USE OF BLACKOUT:  I request that excised material, if any, be "blacked out" rather than "whited out" or cut out and that the remaining non-exempt portions of documents will be released as provided under the Freedom of Information Act.

   c.   CLASSIFIED DOCUMENTS:  For "classified" material denied please include the following information:

   The classification (confidential, secret or top secret);

   identity of the classifier;

   date or event for automatic declassification, classification review, or down-grading;

   if applicable, identity of official authorizing extension of automatic declassification or review; and

if applicable, the reason for the extended classification.

    d.    RESERVATION OF APPEAL RIGHTS:  As I expect to appeal any decision to withhold information, I request that you provide me with the office and address to which an appeal should be directed.

    4.    DESTRUCTION OF RECORDS:  Please send a memo (copy to me) to the appropriate units in your office to assure that no records related to this request are destroyed. Please advise me of any destruction of records and include the date and authority for such destruction.

    5.    ITEMIZED INVENTORY:  Please provide a complete itemized inventory and detailed factual justification of total or partial denial of documents.  Specify the number of pages in each document and the total number of pages pertaining to this request.



**U.S. Department of Justice**

Office of Information and Privacy

---

*Telephone: (202) 514-3642*                     *Washington, D.C. 20530*

FEB 2 3 2000         Ex. 3

Mr. Gregory W. Wiercioch                Re:   AG/00-R0279
Texas Defender Service                        DAG/00-R0280
412 Main Street                               ASG/00-R0281
Suite 1150                                    MAP:CLM:BB
Houston, TX 77002

Dear Mr. Wiercioch:

    This is to acknowledge receipt of your letter, dated
February 2, 2000, which was received in this Office on February
14, 2000, in which you requested, on behalf of your client,
"copies of all Department of Justice Capital Case Review
Committee memoranda, from January 1995 to the present, setting
out the Committee's recommendations about whether to authorize a
death penalty prosecution in death-eligible cases involving
federal crimes."  This Office will process your request on behalf
of the Offices of the Attorney General, Deputy Attorney General,
and Associate Attorney General.

    You have requested expedited processing of your request.  We
interpreted your letter as a request for expedition under the
Department's regulation permitting expedition for requests
involving "[c]ircumstances in which the lack of expedited
treatment could reasonably be expected to pose an imminent threat
to the life or physical safety of an individual."  See 28 C.F.R.
§ 16.5(d)(1)(i)(1999).  Based on the information you have
provided, I have determined that your request for expedited
processing should be granted.  Accordingly, your request has been
assigned to a FOIA Specialist in this Office and is being
processed at this time.

    The records you seek are maintained outside of this Office
and our staff has not yet been able to complete a search to
determine whether there are records within the scope of your
request.  In an effort to speed up our records search, you may
wish to narrow the scope of your request to limit the number of
potentially responsive records or agree to an alternative time
frame for processing, should records be located; or you may wish
to await the completion of our records search to discuss either
of these options.

    With respect to the portion of your letter seeking a waiver
of the customary fees, no decision has been made.  For your
information, however, as a noncommercial, non-media requester,

-2-

your client is entitled to two free hours of search time per component searched and one hundred free pages of records per component. See 28 C.F.R. § 16.11. Therefore, the issue of fees will only arise after those thresholds are met. If your fee waiver request is denied, we will notify you and inform you if the fees total more than the $50.00 you have agreed to pay.

If you have any questions, wish to discuss reformulation, or an alternative time frame for the processing of your request, you may contact Bill Benson, the analyst handling this request, at (202) 616-5461.

Sincerely,

Melanie Ann Pustay

Melanie Ann Pustay
Deputy Director

U.S. Departmc of Justice

Criminal Division

_Washington, D.C.   20530_

MAR 3 1 2000

CRM-200000102F

Gregory W. Wiercioch, Esq.
Texas Defender Service
412 Main, Suite 1150
Houston, Texas   77002

Dear Mr. Wiercioch:

This is in response to your request dated December 21, 1999, for "copies of all Department of Justice Capital Case Review Committee memoranda, from January 1995 to the present, setting out its recommendations about whether to authorize a death penalty prosecution in death-eligible cases involving federal crimes".

The Capital Cases Unit has conducted a search and identified approximately 382 memorandums consisting of approximately 7,650 pages that would be responsive to your request. In light of our review, we have determined to withhold these documents in full pursuant to the following Freedom of Information Act Exemption set forth in 5 U.S.C. 555(b)

(5)   which permits the withholding of inter-agency or intra-agency memorandums or letters which reflect the predecisional, deliberative processes of the Department, and/or which consist of attorney work product prepared in anticipation of specific litigation.

You have a right to an administrative appeal of this denial of your request. Department regulations provide that such appeals must be filed within sixty days of your receipt of this letter. 28 C.F.R. 16.9. Your appeal should be addressed to: The Office of Information and Privacy, United States Department of Justice, Flag Building, Suite 570, Washington, D.C. 20530. Both the envelope and the letter should be clearly marked with the legend "FOIA Appeal." If you exercise this right and your appeal is denied, you also have the right to seek judicial review of this action in the federal judicial district (1) in which you

- 2 -

reside, (2) in which you have your principal place of business, (3) in which the records denied are located, or (4) for the District of Columbia.

Sincerely,

Thomas J. McIntyre, Chief
Freedom of Information/Privacy Act Unit
Office of Enforcement Operations

**U.S. Department of Justice**

Office of Information and Privacy

Telephone: (202) 514-3642

Washington, D.C. 20530

MAR 28 2000

Mr. Gregory W. Wiercioch
Texas Defender Service
412 Main Street
Suite 1150
Houston, TX 77002

Re:   DAG/00-R0280
      MAP:TSW:BB

Dear Mr. Wiercioch:

This responds to your Freedom of Information Act request, dated February 2, 2000, for "copies of all Department of Justice Capital Case Review Committee memoranda, from January 1995 to the present, setting out the Committee's recommendations about whether to authorize a death penalty prosecution in death-eligible cases involving federal crimes." This response is made on behalf of the Office of the Deputy Attorney General.

A search was conducted in the Office of the Deputy Attorney General and approximately 2,640 pages of responsive records were located. I have determined that these records should be withheld in full pursuant to Exemptions 5 and 7(C) of the FOIA, 5 U.S.C. § 552(b)(5) and (7)(C). Exemption 5 pertains to certain inter- and intra-agency communications protected by the deliberative process and attorney work-product privileges. Exemption 7(C) pertains to records or information compiled for law enforcement purposes, the release of which could reasonably be expected to constitute an unwarranted invasion of the personal privacy of third parties. None of the information being withheld is appropriate for discretionary disclosure.

We are continuing to search for responsive records in the Office of the Attorney General.

If you are not satisfied with my action on this request, you may administratively appeal from this denial by writing to the Co-Director, Office of Information and Privacy, United States Department of Justice, Flag Building, Suite 570, Washington, D.C. 20530-0001, within sixty days from the date of this letter. Both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Melanie Ann Pustay
Deputy Director

EXECUTIVE DIRECTOR
JIM MARCUS

MANAGING ATTORNEY -
AUSTIN OFFICE
MAURIE LEVIN

STAFF ATTORNEYS
BRYCE BENJET
ELIZABETH DETWEILER
ANDREW HAMMEL
GREGORY W. WIERCIOCH

LEGAL ASSISTANT
ARACELI G. SEPULVEDA

PARALEGAL
MICHAEL HEATH

# TEXAS DEFENDER SERVICE

BOARD OF DIRECTORS
MIKE CHARLTON, CHAIRMAN
JOHN E. ACKERMAN
RICHARD BURR
DAVID R. DOW
EDEN E. HARRINGTON
JAN E. HEMPHILL
ROBERT MORROW
ROBERT C. OWEN
PROF. JEFF POKORAK
MARSHA RUTENBAR
RAOUL D. SCHONEMANN
MANDY WELCH

412 MAIN, SUITE 1150, HOUSTON, TEXAS 77002
VOICE: (713) 222-7788 | FAX: (713) 222-0260

Tuesday, May 23, 2000

Co-Director
Office of Information and Privacy
United States Department of Justice
Flag Building, Suite 570
Washington, D.C. 20530-0001

**VIA FEDERAL EXPRESS OVERNIGHT DELIVERY**

Re:   Freedom of Information Act Appeal, DAG/00-R0280.
      <u>This appeal is being taken on behalf of a death row inmate.</u>

Dear Co-Director:

This is an appeal under the Freedom of Information Act, 5 U.S.C. § 552.

I am administratively appealing the improper denial of my Freedom of Information Act request, dated February 2, 2000, to obtain copies of all Department of Justice Capital Case Review Committee memoranda, from January 1995 to the present, setting out the Committee's recommendations about whether to authorize a death penalty prosecution in death-eligible cases involving federal crimes.  In a letter dated March 28, 2000, Melanie Ann Pustay, the Deputy Director of the Office of Information and Privacy, informed me that my FOIA request had been denied.  She determined that the records "should be withheld in full pursuant to Exemptions 5 and 7(C) of the FOIA, 5 U.S.C. § 552(b)(5) and 7(C)."  For your convenience, I have enclosed a copy of Ms. Pustay's letter denying my FOIA request, along with my original request for the information.

The Freedom of Information Act clearly contemplates the disclosure of the information that I have requested.  In October 1993, United States Attorney General Janet Reno announced a new standard for federal agencies to consider in determining whether to invoke an exemption

AUSTIN OFFICE: 205 W. 9TH STREET, SUITE 201, AUSTIN, TEXAS 78701
VOICE: (512) 320-8300 | FAX: (512) 477-2153

May 23, 2000
Page 2

to disclosure of information under FOIA. Under the new policy, even if the requested information arguably or technically falls within an exemption to public disclosure, federal agencies should not invoke that exemption unless they can point to "foreseeable harm" that will occur as the result of the disclosure. Memorandum for Heads of Departments and Agencies re: FOI Act, Office of the Attorney General (Oct. 4, 1993). This standard resulted in Ms. Reno's decision to rescind a 1981 Reagan administration policy on the defense of agency actions in FOIA litigation, ordering that the Justice Department no longer defend an agency's decision to withhold information merely because there is a 'substantial legal basis' for doing so. Instead, Ms. Reno said, in deciding whether to defend a non-disclosure decision, the Department would apply "a presumption of disclosure." Administration Tells Agencies to Tilt Toward FOIA Disclosure, 62 USLW 2246 (Oct. 26, 1993).

The purpose of Exemption 5 is to encourage candor among agency personnel in the writing of preliminary or pre-decisional documents. However, under the 1993 Reno memorandum, agencies should not invoke Exemption 5 unless they conclude that the agency personnel who authored the documents actually would have changed their views or recommendations if they had known that the documents would eventually be made available to the public.

It is clear that the members of the Capital Case Review Committee made their written recommendations with the knowledge that the Attorney General would ultimately disclose these documents to the public. On August 17, 1994, Attorney General Janet Reno assured Congressman Cleo Fields that "there will be absolutely no bias in our ongoing administration of capital punishment." To attain this goal, Ms. Reno stated that the Department of Justice would create "an appropriate mechanism for post-trial disclosure of the Department's capital prosecution decisions, so that the public can review and understand the basis for such decisions." Ms. Reno told Congressman Fields that this procedure would be in place before the effective date of the 1994 Crime Bill expanding the federal death penalty. For your convenience, I have enclosed a copy of Attorney General Janet Reno's letter to Congressman Fields.

The Justice Department did not establish the death penalty authorization protocol or the Capital Case Review Committee until January 1995, months after Ms. Reno's letter to Congressman Fields. I have not requested any documents or written recommendations prior to January 1995. Moreover, Attorney General expressly recognized the value of disclosing this information to the public. Consequently, the Department should not now be permitted to hide behind Exemption 5. The requested information should be made public.

Even if you should decide that the requested information is exempted from public disclosure, Exemption 5 does not encompass purely factual portions of pre-decisional agency documents. Accordingly, I ask that those portions of each written recommendation dealing with the facts of the crime and the alleged evidence of guilt or innocence, along with potential aggravating or mitigating factors at sentencing, be segregated from those portions of the document setting out

May 23, 2000
Page 3

the reasons for the Capital Case Review Committee's recommendation whether to seek the death penalty in a specific case.

Exemption 7(C) is inapplicable to the requested information as well. Under Exemption 7(C), agencies must balance the degree of intrusion into personal privacy against the public's interest in disclosure. The 1993 Reno memorandum intended that agencies balancing privacy and public interests apply a presumption of disclosure. Coupled with Ms. Reno's 1994 letter to Congressman Fields expressly acknowledging the public's interest in the Department's capital prosecution decisions, it is clear that any personal privacy interests are substantially outweighed by the public's interest in the disclosure of the requested information. Moreover, even if Exemption 7(C) should apply, the Department can simply redact from the Capital Case Review Committee's written recommendations the names of individuals whose privacy would otherwise be invaded by disclosure.

Finally, I ask that you give this administrative appeal expedited consideration. The information I requested is critical to my preparation of an application for executive clemency that I will be submitting to President Clinton on behalf of Juan Raul Garza, a federal death row inmate. Although no execution date has been scheduled, I anticipate that one may be set within the next few days. Some courts have recognized that FOIA requests from death row inmates facing serious execution dates should be entitled to expedited handling. See, e.g., Cleaver v. Kelley, 427 F. Supp. 80, 81 (D.D.C. 1976); Morrow v. FBI, 2 F.3d 642, 645 (5th Cir. 1993) (Wiener, J., concurring). Pursuant to 28 C.F.R. § 16.5(d)(1)(i) permitting expedited consideration for requests involving "[c]ircumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual," Ms. Pustay granted my request for expedited consideration in a letter dated February 23, 2000. I have enclosed a copy of her letter granting expedited consideration. In any event, I will expect to receive your decision within twenty business days, as required under the statute.

I appreciate your prompt attention to this important matter.

Sincerely,

Gregory W. Wiercioch

 **YAHOO! NEWS**

WITH THE YAHOO! VISA REWARDS PROGRAM, YOU CAN EARN POINTS FOR THESE MERCHANTS

Barnes & Noble    ▼    Submit Answer

Home | Top Stories | Business | Tech | Politics | World | Local | Entertainment | Sports | Science | He

**Top Stories Headlines**

Sources: Reuters | AP | AP U.S. | ABCNews | Full Coverage

Thursday February 10 1:07 PM ET

# U.S. Official to Study Death Penalty Racial Bias

By James Vicini

WASHINGTON (Reuters) - A top U.S. Justice Department official said on Thursday that he has been ordered by Attorney General Janet Reno to study whether inappropriate racial disparities exist in the federal death penalty system.

``This study was ordered by the attorney general ... out of an abundance of caution," Deputy Attorney General Eric Holder said in disclosing the review that began several months ago.

``We don't have anything, to our knowledge, that gives us reason to believe that there is a disparity within the system. But we want to make sure. We want to make sure that that is so," he told reporters at the Justice Department.

Of the 21 people awaiting execution in a federal death-row prison in Indiana, 14 are black. Questions have been raised about whether the death penalty unfairly discriminates against blacks, an argument the U.S. Supreme Court has rejected.

Holder said Reno initially asked him when he was U.S. attorney in Washington, D.C., to examine possible racial disparities in the federal criminal justice system, and then expanded the study to include the death penalty.

He said the review was requested before Reno decided to seek the death penalty for Carl Cooper, the accused killer of three employees at a Starbucks coffee shop in the Georgetown section of Washington, D.C., a crime in 1997 that drew national attention.

A lawyer for Cooper, who is black, has said he will challenge the constitutionality of the federal death penalty law and the disparity in its application.

Reno's decision has been controversial, as she overruled U.S. Attorney Wilma Lewis, the prosecutor in the case who did not recommend seeking the death penalty.

The last execution in Washington, D.C., occurred in 1957. The last trial in a capital case was in 1972.

2/10/00 2:04 PM

While Cooper is being prosecuted under federal law, local law does not provide for capital punishment as voters rejected the death penalty in 1992.

Holder acknowledged he was involved in the deliberations in the Cooper case, but declined to detail his role. He emphasized that it was a federal, and not local, case.

``Federal cases have to be judged on a nationwide standard. We have one system, and it is appropriate for people in the federal system all to be treated the same way. And that's one of the things that we try to search for, especially when it comes to the death penalty," he said.

Holder said the death penalty review would be a historical study.

``We want to make sure that the system us as fair as it can be, and we are always looking for ways to improve the system," he said.

<u>Formatted version</u>



**Search:** • Stories    Photos    Full Coverage

**<u>Home</u> | Top Stories | <u>Business</u> | <u>Tech</u> | <u>Politics</u> | <u>World</u> | <u>Local</u> | <u>Entertainment</u> | <u>Sports</u> | <u>Science</u> | <u>He</u>**

<u>Questions or Comments</u>
Copyright © 2000 Reuters Limited. All rights reserved.
Republication or redistribution of Reuters content is expressly prohibited without the prior written consent of Reuters.
Reuters shall not be liable for any errors or delays in the content, or for any actions taken in reliance thereon.

2/10/00 2:04 P

## COMPLAINT
## LIFE OF A VICTIM IN IMMINENT DANGER
## PRECAUTIONARY MEASURES

1.      **INTRODUCTION**

The Complainants request the Organisation of American States, on behalf of the Victim, JUAN RAUL GARZA, who is facing imminent execution of death, to present this Petition to the Inter-American Commission on Human Rights ("IACHR") at the earliest opportunity pursuant to Articles 51 and 52 of the Regulations of the IACHR, as approved on April 8 1980 and as subsequently amended, and requesting that the IACHR exercise its powers under Article 29 in providing PROVISIONAL RELIEF by written and oral communication with the President of the United States of America, Mr. William Jefferson Clinton, and by seeking from the Inter-American Court of Human Rights an interpretive opinion of the Victim's Complaint in regard to the application of the relevant Articles identified in paragraph 5, below, of the American Declaration of the Rights and Duties of Man.

The Complainants request an oral hearing of this matter at the next session of the IACHR. This is an urgent matter as the Victim has exhausted his domestic rights to challenge the conviction that result in his sentence of death and that sentence. As a consequence the Federal Government of the United States of America is now able to set an execution date. The Federal Government of the United States of America has informed the Victim's domestic attorney that an execution date may be set for the end of February 2000.

2.      **VICTIM**

| | | |
|---|---|---|
| 2.1 | Name | Juan Raul Garza |
| 2.2 | Age | 43 years old |
| 2.3 | Nationality | American |
| 2.4 | Inmate Number | 62728-079 D |
| 2.5 | Social Security Number | 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 |
| 2.6 | Marital Status | Divorced |

2.7     Address     Mailing:     P.O. Box 33
                                 Terre Haute, Indiana 47808

                    Physical:    United States Penitentiary
                                 State Highway 63 South
                                 Terre Haute, Indiana 47808

2.8     Telephone Number     812-238-1531

3.      **GOVERNMENT ACCUSED OF VIOLATIONS**

United States of America

4.      **ALLEGED HUMAN RIGHTS VIOLATIONS**

4.1     Right to Life

The Complainant relies on the facts set out in paragraph 4.2 in relation to this complaint.

4.2     Right to a fair trial



# Death Penalty Information Center

1320 Eighteenth Street, NW, 5th Fl., Washington, DC 20036
202/293-6970 - Fax: 202/822-4787

# Racial Disparities in Federal
# Death Penalty Prosecutions 1988-1994

**Staff Report by the Subcommittee on Civil and Constitutional Rights
Committee on the Judiciary
One Hundred Third Congress, Second Session
March 1994**

prepared with the assistance of the Death Penalty Information Center

## TABLE OF CONTENTS

Summary
The Federal Death Penalty
Pace of Prosecutions Increasing
Background on Race and the Death Penalty
Conclusion
Appendix: Federal Death Penalty Prosecutions, 1988-94

*"Twenty years have passed since this Court declared that the death penalty must be imposed fairly, and with reasonable consistency, or not at all, and, despite the effort of the states and courts to devise legal formulas and procedural rules to meet this daunting challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake."*

--Justice Harry A. Blackmun, Feb. 22, 1994 [1]

## Summary

Racial minorities are being prosecuted under federal death penalty law far beyond their proportion in the general population or the population of criminal offenders. Analysis of prosecutions under the federal death penalty provisions of the Anti-Drug Abuse Act of 1988 [2] reveals that 89% of the defendants selected for capital prosecution have been either African-American or Mexican-American. Moreover, the number of prosecutions under this Act has been increasing over the past two years with no decline in the racial disparities. All ten of the recently approved federal capital prosecutions have been against black

defendants. This pattern of inequality adds to the mounting evidence that race continues to play an unacceptable part in the application of capital punishment in America today. It confirms Justice Blackmun's recent conclusion that "the death penalty experiment has failed."

# The Federal Death Penalty

Since the Supreme Court's 1972 decision in *Furman v. Georgia*,[3] the death penalty has been almost exclusively a state prerogative. Congress has so far not adopted the general sentencing procedures that would reinstate the federal death penalty. No federal executions have been carried out since 1963 and, until very recently, prosecutions under federal death penalty law were rare. But that began to change over the past few years, and can be expected to change dramatically if the House adopts pending legislation to restore generally -- and expand -- the federal death penalty.

In 1988, President Reagan signed the Anti-Drug Abuse Act. This legislation included a provision, sometimes referred to as the "drug kingpin" death penalty, which created an enforceable federal death penalty for murders committed by those involved in certain drug trafficking activities. The death penalty provisions were added to the "continuing criminal enterprise" statute first enacted in 1984, 21 U.S.C. SS 848. The drug trafficking "enterprise" can consist of as few as five individuals, and even a low-ranking "foot soldier" in the organization can be charged with the death penalty if involved in a killing.

As the first enforceable federal death penalty adopted after *Furman*, SS 848 offers a forewarning as to how a general federal death penalty might be applied. This report, prepared with the assistance of the Death Penalty Information Center in Washington, D.C. and with case data from the Federal Death Penalty Resource Counsel Project, examines the application of SS 848.

Three-quarters of those convicted of participating in a drug enterprise under the general provisions of SS 848 have been white and only about 24% of the defendants have been black. [4] However, of those chosen for death penalty prosecutions under this section, just the opposite is true: 78% of the defendants have been black and only 11% of the defendants have been white. (See Fig. 1). Although the number of homicide cases in the pool that the U.S. Attorneys are choosing from is not known (the Justice Department has not responded to Congressional inquiries for that data), the almost exclusive selection of minority defendants for the death penalty, and the sharp contrast between capital and non-capital prosecutions under SS 848, indicate a degree of racial bias in the imposition of the federal death penalty that exceeds even pre-*Furman* patterns.



Fig. 1: Race of Defendants Selected for Capital Prosecution

Federal regulations require that local U.S. Attorneys obtain the personal written authorization of the Attorney General of the United States before proceeding with a capital prosecution. So far, former Attorneys General Thornburgh and Barr, and present Attorney General Reno have approved capital prosecutions against a total of 37 defendants under the 1988 "kingpin" law. Twenty-nine of the defendants have been black and 4 have been Hispanic. All ten of the defendants approved by Attorney General Reno for capital prosecution have been black. Judging by the death row populations of the states, no other jurisdiction comes close to this nearly 90% minority prosecution rate.[5]

## Pace of Prosecutions Increasing

The pace of these prosecutions has been substantially increasing over the past two years. Although widely touted during the 1988 election year as a "tough" response to drug crime, there were only seven defendants prosecuted under this Act in the first three years after its passage and only one death sentence handed down. However, in 1992 alone, capital prosecutions against fourteen defendants were announced and another five death sentences resulted from these cases. Since January, 1993, sixteen more prosecutions have been announced. [6] (See Fig. 2).



Fig. 2: Capital Prosecutions Under § 848

The underlying crimes for which these defendants are being prosecuted are not excusable because the offenders are members of minorities. But the statistics raise the question of why these cases were chosen out of the large number of drug-related homicides over the past five years. By way of comparison, the proportion of African-Americans admitted to federal prison for all crimes has remained fairly constant between 21% and 27% during the 1980s, while whites accounted for approximately 75% of new federal prisoners. [7] Yet, when it comes to the federal death penalty, the scales dramatically tip the other way.

The federal government employed the death penalty for a variety of crimes prior to the 1972 *Furman* decision. But the racial breakdown was also just the opposite from current death penalty prosecutions. Between 1930 and 1972, 85% of those executed under federal law were white and 9% were black. The dramatic racial turnaround under the drug kingpin law clearly requires remedial action.

Although challenged at a Congressional hearing to provide an explanation for such racial disparities, and asked by the Chairman of this Subcommittee for data on potentially capital cases referred to Washington for approval by federal prosecutors, the Justice Department has offered no response.[8]

It is worth noting that some of the death penalty prosecutions under SS 848 have been against defendants

who do not seem to fit the expected "drug kingpin" profile. In a number of cases, the U.S. Attorneys have sought the death penalty against young inner-city drug gang members and relatively small-time drug traffickers. [9] In other cases, the death penalty was returned against those directly involved in a murder, while the bosses who ordered the killings were given lesser sentences. [10]

# Background on Race and the Death Penalty

Throughout American history, the death penalty has fallen disproportionately on racial minorities. For example, since 1930 nearly 90% of those executed for the crime of rape in this country were African-Americans.[11] Currently, about 50% of those on the nation's death rows are from minority populations representing 20% of the country's population.

In 1972, the United States Supreme Court overturned existing death penalty statutes in part because of the danger that those being selected to die were chosen out of racial prejudice. As the late Justice Douglas said in his concurrence overturning the death penalty:

[T]he discretion of judges and juries in imposing the death penalty enables the penalty to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect and unpopular minority, and saving those who, by social position, may be in a more protected position. [12]

Following the *Furman* decision, legislatures adopted death sentencing procedures that were supposed to eliminate the influence of race from the death sentencing process. However, evidence of racial discrimination in the application of capital punishment continues. Nearly 40% of those executed since 1976 have been black, even though blacks constitute only 12% of the population. And in almost every death penalty case, the race of the victim is white. (See Fig. 3). Last year alone, 89% of the death sentences carried out involved white victims, even though 50% of the homicides in this country have black victims.[13] Of the 229 executions that have occurred since the death penalty was reinstated, only one has involved a white defendant for the murder of a black person.



Fig. 3: Race of Victim in Cases Resulting in Execution Since 1976

Race of the victim discrimination was singled out by the U.S. General Accounting Office in its report "Death Penalty Sentencing" which concluded that studies showed:

[The] race of the victim was found to influence the likelihood of being charged with capital murder or

2/1/00 12:52 PM

receiving the death penalty, i.e., *those who murdered whites were found more likely to be sentenced to death than those who murdered blacks.* [14]

This record of racial injustice played a significant part in Justice Harry Blackmun's recent decision to oppose the death penalty in every case. "Even under the most sophisticated death penalty statutes," said Blackmun, "race continues to play a major role in determining who shall live and who shall die." [15]

# Conclusion

Race continues to plague the application of the death penalty in the United States. On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims. On the federal level, cases selected have almost exclusively involved minority defendants.

Under our system, the federal government has long assumed the role of protecting against racially biased application of the law. But under the only active federal death penalty statute, the federal record of racial disparity has been even worse than that of the states. So far, the number of cases is relatively small compared to state capital prosecutions. However, the numbers are increasing, and under legislation currently being considered in Congress, the federal government would play a much wider role in death penalty prosecutions.

---

# APPENDIX

### FEDERAL DEATH PENALTY PROSECUTIONS, 1988-94 [*]

Following enactment of the first modern federal death penalty statute on November 18, 1988, 21 U.S.C. SS848(e)-(q) (the so-called "drug kingpin" murder provision), the Bush and Clinton Administrations have approved death penalty prosecutions under SS 848 against 37 defendants. Of these, four defendants were white, four were Hispanic, and twenty-nine were black. *All 10 of the defendants approved for capital prosecution by Attorney General Reno, and all 15 defendants now awaiting federal death penalty trials or currently on trial, are African-American.*

# Federal Capital Cases Tried to Date

The federal death penalty cases brought to trial during 1989 -1994 by the Bush and Clinton Administrations are listed below:

- A white **Alabama** marijuana grower named Ronald Chandler, was sentenced to death for the murder for hire of a subordinate in his drug ring. Chandler's convictions and death sentence were affirmed by a panel of the Eleventh Circuit July 19, 1993; a petition for writ of certiorari is now pending before the United States Supreme Court. Claiming innocence, Chandler refused a pretrial plea bargain offer for life without possibility of parole. *United States* v. *Chandler*, 996 F.2d 1073 (11th Cir. 1993).
- Three of four young black inner-city gang members in Richmond, **Virginia**, were sentenced to

death on February 16, 1993, for their roles in eleven crack-related murders. *United States* v. *Tipton et al.*, 3-92-CR68 (E.D. Va.). The trial of a fourth defendant, Vernon Thomas, was severed. On April 23, 1993, moments before a scheduled hearing on Mr. Thomas's motion to bar the death penalty due to his mental retardation, the government withdrew its request for the death penalty. Mr. Thomas was ultimately convicted and sentenced to life imprisonment.

- A Hispanic drug distributor was sentenced to death by a jury on August 2, 1993 in Brownsville, **Texas**, in connection with the murders of three other drug traffickers in the Brownsville area. *United States* v. *Juan Raul Garza*, No. CR 93-0009 (S.D. Tex.). Attorney General Barr authorized the prosecution to seek the death penalty in December, 1992. Mr. Garza's appeal is pending before the U.S. Court of Appeals for the 5th Circuit.

- Two Hispanic defendants in **Texas** were sentenced to life imprisonment and forty years, respectively, for the marijuana-related murder of a state police officer after a joint trial. The sentencing jury found no facts legally warranting the death penalty. *United States* v. *Reynaldo & Baldemar Villarreal* No. 9:91CR4 (E.D. Tex. 1991), *aff'd*, 963 F.2d 725 (5th Cir.), *cert. denied*, 113 S.Ct. 353 (1992).

- Two black **Chicago** gang members received life sentences for cocaine-related murders after separate trials. The Government had offered one defendant, but not the other, a plea bargain prior to trial. *United States* v. *Alexander Cooper & Anthony Davis*, No. 89-CR-0580 (N.D. ILL. 1991).

- A white Mafia contract killer received a life sentence from a Brooklyn, **New York** jury after being convicted of eight murders, three of which qualified as capital crimes under 21 U.S.C. SS 848. *United States* v. *Pitera*, 5 F.3d 624 (2d Cir. 1993).

- A young black **New Jersey** gang member committed suicide during his federal capital trial. *United States* v. *Bilal Pretlow*, No. 90-CR-238 (D.N.J.).

- One Hispanic and two white defendants were tried jointly in connection with the drug-related kidnap/murder of a Muskogee, **Oklahoma** auto dealership employee. *United States* v. *Hutching et al.*, No. CR-032-S (E.D. Okl.). The two capitally-charged "managers" of the drug enterprise received life sentences from the jury, while the lowest-level defendant, John McCullah (who, unlike the bosses, had been present at the killing) was sentenced to death on March 23, 1993.

# Federal Capital Prosecutions Not Yet Tried:

Capital prosecutions initiated since early 1992 which are still pending (either as capital or noncapital cases) in federal district courts involve indictments charging:

- Two black **New Orleans** inner-city gang members, in connection with an allegedly drug-related murder. *United States* v. *Green & Brown*, E.D. La. No. 92-46. On November 24, 1992, the Government dropped its request for the death penalty in this case.

- One black Tampa, **Florida** drug distributor, for having allegedly ordered a murder in retaliation for the theft of drugs. *United States* v. *Mathias*, (M.D. Fla. No. 91-301-CR-T-17(A)). Trial is set in this case for February 2, 1994.

- One black **Atlanta** drug distributor in connection with three murders. *United States* v. *Williams*, No. 1:92-CR-142 (N.D.Ga.). No trial date is set as yet.

- Two black crack cocaine dealers in Macon, **Georgia**, in connection with the murders of two other crack dealers. *United States* v. *Tony Chatfield and Arleigh Carrington*, (M.D. Ga. No. 92-82MAC-WDC). Attorney General Barr authorized this death prosecution in his last week in office. On December 6, 1993, the government dropped its request for the death penalty against these two defendants.

- *United States* v. *Reginald Brown et al.*, (E.D.**Mich**.Cr. No. 92-81127). This case reportedly

2/1/00 12:52 PM

involved *six* death authorizations against members of a cocaine distribution organization alleged to be responsible for a total of twelve murders over a 4-year period. The initial authorization occurred during the Bush Administration, but the authorizations were not announced until June, 1993. Only three of the six defendants against whom the death penalty has been authorized are currently in custody. One defendant, *Terrance Brown*, has been found dead, apparently a homicide victim.

The Federal Death Penalty Resource Counsel Project is aware of 7 cases, involving 16 defendants, in which the death penalty is reported to have been authorized by Attorney General Reno or announced since she took office. All 16 defendants are African-American. Three of the cases have been brought in jurisdictions (New York, Michigan, and the District of Columbia) which do not have capital punishment statutes. The cases are:

- *United States* v. *Darryl Johnson*, (W.D.N.Y. Cr. No. 92-159-C-S), involving two alleged cocaine-related killings by a Buffalo, **New York** group. Trial is not anticipated before the fall of 1994.
- *United States* v. *Wayne Anthony Perry* (D.C.D.C. No. 92-CR-474), an alleged hitman for a **D.C.** cocaine distribution ring; eight homicide counts. Trial is set for February 8, 1994.
- *United States* v. *Michael Murray*, (M.D.Pa. Cr. No. 1:CR-92-200), involves the killing of a Harrisburg, **Pennsylvania** drug dealer by a gang headed by one Jonathan Bradley. DOJ reportedly declined to approve the U.S. Attorney's request to authorize the death penalty against Bradley, who allegedly ordered the killing, and against another participant in the shooting, Emmanuel S. Harrison.
- *United States* v. *Edward Alexander Mack et al.*, (S.D. Fla. 93-0252-CR-Ungaro-Benages), involves two drug-related murders in the course of a **Miami** drug trafficking operation. Three defendants are facing the death penalty in this case; trial is not anticipated until the latter part of 1994. Attorney General Reno authorized this capital prosecution in early January 1994.
- *United States* v. *Jean Claude Oscar et al.*, (E.D.Va. 93 CR 131) involves three capitally charged defendants and two crack-related murders in **Norfolk**, Va. Attorney General Reno authorized this capital prosecution in November 1993.
- *United States* v. *Todd Moore*, (E.D. Va. 1994), the prosecution of this black defendant in **Norfolk**, Va. was announced March 8, 1994.

# References

[1] Callins v. Collins, No. 93-7054 (1994) (Blackmun, J., dissenting) (Supreme Court denial of review).

[2] 21 U.S.C. 848(e)-(q).

[3] 408 U.S. 238 (1972).

[4] U.S. Dept. of Justice, Bureau of Justice Statistics, *Special Report: Prosecuting Criminal Enterprises,* , at 6, Table 10 (convictions 1987-90) (1993).

[5] See NAACP Legal Defense Fund, *Death Row, U.S.A.,* January 1994 (death rows by state with racial breakdowns).

[6] Prosecutions against 10 defendants were approved by Attorney General Reno, including at least one

in 1994. Prosecutions against 6 other defendants were approved in the previous Administration, but were not announced until June, 1993.

[7] Bureau of Justice Statistics, *Sourcebook of Criminal Justice Statistics, 1991*, at table 6.78, p. 644 (1992).

[8] On October 21, 1993, Rep. Melvin Watt (D-NC) asked then Deputy Attorney General Philip Heymann for an explanation of the racial disparities in capital prosecutions during the course of a House Judiciary Subcommittee hearing on the Administration's crime bill. Mr. Heymann promised a reply in two weeks. To date, Rep. Watt has received no response to his inquiry. Death Penalty Information Center phone conversation with Rep. Watt's office, Feb. 28, 1994.

During the same hearing, Rep. Craig Washington (D-Tex.) remarked to Mr. Heymann that "if some redneck county in Texas had come up with figures like that, you'd been down there wanting to know why." See Federal Death Penalty Update, Newsletter of Federal Death Penalty Resource Counsel Project, January, 1994.

[9] See, e.g., United States v. Tipton et al., 3-92-CR68 (E.D. Va.) (prosecution of four young black inner-city gang members in Richmond, Va.); United States v. Bilal Pretlow, No. 90-CR-238 (D.N.J.) (a young black New Jersey gang member who committed suicide during his trial); United States v. Chandler, 996 F.2d 1073 (11th Cir. 1993) (prosecution of rural Alabama marijuana grower in murder-for-hire scheme).

[10] See, e.g., United States v. Hutching et al., No. CR-032-S (E.D. Okl.) (two "managers" of the drug enterprise received life sentences for murder while lower level defendant who was present at the murder was sentenced to death); United States v. Michael Murray, Cr. No. 1: CR-92-200 (M.D. Pa.) (Dept. of Justice reportedly declined to approve the U.S. Attorney's request to authorize the death penalty against the gang leader, Jonathan Bradley, whom the indictment alleges ordered the killing. A death sentence is being sought against Murray who was 19 years old at the time of the incident.). Information obtained from the Federal Death Penalty Resource Counsel Project report, Feb. 15, 1994.

[11] U.S. Dept. of Justice, Bureau of Justice Statistics, *Capital Punishment, 1981* (1982).

[12] Furman v. Georgia, 92 S. Ct. 2726, 2735 (1972) (Douglas, J., concurring).

[13] See, e.g., S. LaFraniere, *FBI Finds Major Increase in Juvenile Violence in Past Decade*, Washington Post, Aug. 30, 1992, at A13 (half of U.S. murder victims are black).

[14] U.S. General Accounting Office, *Death Penalty Sentencing* 5 (Feb. 1990) (emphasis added).

[15] Callins v. Collins, No. 93-7054 (1994) (Blackmun, J., dissenting).

[*] Case data provided by the Federal Death Penalty Resource Counsel Project, Columbia, SC.

EXECUTIVE DIRECTOR
JIM MARCUS

MANAGING ATTORNEY -
AUSTIN OFFICE
MAURIE LEVIN

STAFF ATTORNEYS
BRYCE BENJET
ELIZABETH DETWEILER
ANDREW HAMMEL
GREGORY W. WIERCIOCH

LEGAL ASSISTANT
ARACELI G. SEPULVEDA

PARALEGAL
MICHAEL HEATH

BOARD OF DIRECTORS
MIKE CHARLTON, CHAIRMAN
JOHN E. ACKERMAN
RICHARD BURR
DAVID R. DOW
EDEN E. HARRINGTON
JAN E. HEMPHILL
ROBERT MORROW
ROBERT C. OWEN
PROF. JEFF POKORAK
MARSHA RUTENBAR
RAOUL D. SCHONEMANN
MANDY WELCH

# TEXAS DEFENDER SERVICE

412 MAIN, SUITE 1150, HOUSTON, TEXAS 77002
VOICE: (713) 222-7788 | FAX: (713) 222-0260

Monday, March 6, 2000

The Honorable Janet Reno
Attorney General
United States Department of Justice
Tenth & Constitution Avenue, N.W.
Washington, D.C. 20530

Re:     Juan Raul Garza, Federal Death Row Inmate.

Dear Attorney General Reno:

I represent Juan Raul Garza, a Mexican-American inmate on federal death row in Terre Haute, Indiana. Mr. Garza stands on the brink of becoming the first person executed by the United States Government since 1963. He has exhausted all his appeals. The only proceeding that remains is an application for executive clemency to President Clinton.

I read with great interest Deputy Attorney General Eric Holder's announcement that you had recently ordered the Department of Justice to conduct a study to determine whether inappropriate racial disparities exist within the federal death penalty authorization process. However, I was disheartened by Mr. Holder's assertion that there is no reason to believe that such disparities exist. I was also disappointed to read that the Justice Department will not await the results of the study before proceeding to set an execution date for Mr. Garza.

The statistical information currently available to the public is appalling. A 1994 staff report by the House Subcommittee on Civil and Constitutional Rights found that, in cases where the Government decided to seek capital punishment, 89% of the defendants were either African-American or Latino. More recent statistics show little improvement. Of the 133 defendants authorized for death penalty prosecution from 1988 to 1998, 76% were members of racial minorities.

AUSTIN OFFICE: 205 W. 9TH STREET, SUITE 201, AUSTIN, TEXAS 78701
VOICE: (512) 320-8300 | FAX: (512) 477-2153

March 6, 2000
Page 2

These statistics have improved during your administration, not only because of your commitment to eradicating racial discrimination in the criminal justice system but also because of the elaborate protocols that you have established to review every potentially death-eligible federal case in the country. I know that you strongly support President Clinton's oft-stated belief that the issue of race is the challenge of the twenty-first century.

As Mr. Garza's attorney of last resort, I need to thoroughly review the statistical and factual information contained in the Justice Department's files about the federal death penalty authorization process. I need to determine – independently of the Justice Department – whether racial disparities exist in the death penalty authorization process. I also need to determine whether any cases with facts similar to those in Mr. Garza's case were not authorized for capital prosecution. I have anecdotal information that some other cases involving multiple murders and narcotics trafficking were not authorized for capital prosecution. I believe that I am entitled to know why.

I have filed a FOIA request for some of this information. However, I respectfully seek your assistance in facilitating this process. I urge you to allow me, as soon as possible, to obtain copies of the same documents that the Justice Department is reviewing in its study of the death penalty authorization protocols. It is absolutely imperative that I have the opportunity to examine this information before I file Mr. Garza's application for executive clemency.

The President must have accurate and up-to-date information about these important issues when he considers Mr. Garza's request for clemency. Refusing to make this information available to the public would seem to suggest, as the late Justice William Brennan once eloquently said, "a fear of too much justice." McCleskey v. Kemp, 481 U.S. 279, 339 (1987) (Brennan, J., dissenting).

I will be in Washington, D.C., from March 23rd until March 30th. If you have any time during those days, I would appreciate the opportunity to meet with you or your staff about this matter.

I look forward to hearing from you.

Sincerely,

Greg Wiercioch

Gregory W. Wiercioch

May 25, 2000
Page 2

approved or disapproved or otherwise disposed of, along with correspondence, internal memoranda and other documents of whatever nature relating to such decision.

3.    For each of the cases described in Item (2), above, the following information:

a.    the "Death Penalty Prosecution Memorandum" as described at § 73 of the Department of Justice Criminal Resource Manual;

b.    the "Death Penalty Evaluation Form for Homicides under Titles 8, 18, and 49" and all attached memoranda as described at § 74 of the Department of Justice Criminal Resource Manual;

c.    the "Non-decisional Case Identifying Information" form identifying the race of the defendant and victims as described at § 74 of the Department of Justice Criminal Resource Manual;

d.    the "Death Penalty Evaluation Form for Killings under Title 21" as described at § 75 of the Department of Justice Criminal Resource Manual; and

e.    the "Non-decisional Case Identifying Information" form identifying the race of the defendant and victims as described at § 75 of the Department of Justice Criminal Resource Manual.

4.    All internal Justice Department standards, policies, practices, or criteria governing or affecting the approval or disapproval of death penalty prosecutions, including those predating the 1995 promulgation of the Department of Justice death penalty authorization protocol.

5.    All standards, policies, practices, or criteria employed by the Department of Justice to guard against the influence of racial, political, or other arbitrary or invidious factors in the selection of cases and defendants for capital prosecution, including those predating the 1995 promulgation of the Department of Justice death penalty authorization protocol.

6.    Any correspondence from the Department of Justice to United States Attorneys and their staffs between November 18, 1988, and the present regarding federal death penalty policies, procedures and selection criteria, or requesting identification of cases for capital prosecution under federal law, including those predating the 1995 promulgation of the Department of Justice death penalty authorization protocol.

May 25, 2000
Page 3

7.  All policies or practice manuals used by the United States Attorney in the Southern District of Texas regarding the factors determining whether to charge defendants under Texas or federal law.

8.  A list of all death-eligible indictments originating in the Southern District of Texas since November 18, 1988, the race of the defendant, and the ultimate disposition of the case.

9.  Any information or data regarding homicides which could have been prosecuted federally as "drug kingpin" offenses under 21 U.S.C. § 848(e), but were instead prosecuted in the state system, whether or not the state pursued the death penalty.

10.  All correspondence from the office of the United States Attorney for the Southern District of Texas regarding the decision to seek the death penalty against Juan Raul Garza, including but not limited to:

   a.  the "Death Penalty Prosecution Memorandum" as described at § 73 of the Department of Justice Criminal Resource Manual;

   b.  the "Death Penalty Evaluation Form for Homicides under Titles 8, 18, and 49" and all attached memoranda as described at § 74 of the Department of Justice Criminal Resource Manual;

   c.  the "Non-decisional Case Identifying Information" form identifying the race of the defendant and victims as described at § 74 of the Department of Justice Criminal Resource Manual;

   d.  the "Death Penalty Evaluation Form for Killings under Title 21" as described at § 75 of the Department of Justice Criminal Resource Manual; and

   e.  the "Non-decisional Case Identifying Information" form identifying the race of the defendant and victims as described at § 75 of the Department of Justice Criminal Resource Manual.

I realize that the large number of FOIA requests you receive may cause a delay in processing my request. However, I ask that you give my request expedited consideration. The records I am seeking are related to my representation of federal death row inmate Juan Raul Garza. Mr. Garza has exhausted his appeals and is on the brink of becoming the first federal prisoner to be executed since 1963. The Honorable Filemon Vela of the Southern District of Texas has tentatively scheduled Mr. Garza's execution for August 5, 2000.

May 25, 2000
Page 4

Some courts have recognized that FOIA requests from death row inmates facing serious execution dates should be entitled to expedited handling.  See, e.g., Morrow v. FBI, 2 F.3d 642, 645 (5th Cir. 1993) (Wiener, J., concurring); Cleaver v. Kelley, 427 F. Supp. 80, 81 (D.D.C. 1976).  In addition, the Code of Federal Regulations authorizes expedited consideration for requests involving "[c]ircumstances in which the lack of expedited treatment could reasonably be expected to pose an imminent threat to the life or physical safety of an individual."  28 C.F.R. § 16.5(d)(1)(i).

This request specifically includes "main" files, including but not limited to numbered and lettered subfiles and "DO NOT FILE" files.  I wish to be sent copies of "see reference" cards, file covers, multiple copies of the same documents if they appear in a file, IA envelopes, enclosures behind file (EBF's) and bulky exhibits.  I also request a search of the ELSUR Index.  I am expressly incorporating the attached "Instructions" in this request.

As you know, the amended FOIA requires you to reduce or waive search and/or copying fees when release of the requested information would be "in the public interest."  I believe that this request fits that category, and therefore I ask that you waive such fees.  If you rule otherwise, and if the fees will exceed $50.00, please inform me of the charge before you fill this request.

Finally, please note my appreciation in your conducting this review in a manner consistent with Justice Department policy statements that:

> urged 'all federal departments and agencies to renew their commitment to the Freedom of Information Act, to its underlying principles of government openness, and to its sound administration.'
>
> [This statement has resulted in Attorney General Reno's decision to] rescind[ ] a 1981 Reagan administration policy on the defense of agency actions in FOIA litigation . . . [ordering that the Justice Department] no longer defend an agency's decision to withhold information merely because there is a 'substantial legal basis' for doing so. Instead, Reno said, in deciding whether to defend a non-disclosure decision, the department will apply a presumption of disclosure.

Administration Tells Agencies to Tilt Toward FOIA Disclosure, 62 USLW 2246 (Oct. 26, 1993).

If you have any questions concerning this request, please call me.  I will expect to receive a reply within ten working days, as provided by the Freedom of Information Act.  I appreciate your prompt attention to this important matter.  I have also filed an identical request with Melanie Ann Pustay, Deputy Director of the Office of Information and Privacy at the Department of Justice.

May 25, 2000
Page 5

Sincerely,

Gregory W. Wiercioch

**Freedom of Information Act/Privacy Act**

Inquiry regarding:   Department of Justice/FBI materials on capital cases and potential capital cases.

## INSTRUCTIONS

I hereby incorporate the following instructions in my FOIA/PA request letter:

1.   "MISSING" FILES:  Please place any "missing" files pertaining to this request on "Special Locate" and advise me that you have done this.

2.   "DUPLICATE" RECORDS:  I wish to make it clear that I want all records in your office "identifiable with my request," even though reports on these records have been sent to Headquarters and even though there may be duplications between the two sets of files. I do not want just "interim" documents.  I want all documents as they appear in the "main" files and "see references" of all units of your agency.  Further I request that all records be produced with the administrative pages.

3.   DENIAL OF REQUEST:  If any part of my request is denied, please list the specific exemption(s) which is (are) being claimed to withhold information for each passage or whole document.

   a.   PARTIAL DISCLOSURE OF DOCUMENT:  If you determine that some portions of the requested materials are exempt, I will expect, as the Act provides, that you will provide me with remaining, non-exempt portions.

   b.   USE OF BLACKOUT:  I request that excised material, if any, be "blacked out" rather than "whited out" or cut out and that the remaining non-exempt portions of documents will be released as provided under the Freedom of Information Act.

   c.   CLASSIFIED DOCUMENTS:  For "classified" material denied please include the following information:

   The classification (confidential, secret or top secret);

   identity of the classifier;

   date or event for automatic declassification, classification review, or down-grading;

   if applicable, identity of official authorizing extension of automatic declassification or review; and

if applicable, the reason for the extended classification.

d.　　RESERVATION OF APPEAL RIGHTS:　As I expect to appeal any decision to withhold information, I request that you provide me with the office and address to which an appeal should be directed.

4.　　DESTRUCTION OF RECORDS:　Please send a memo (copy to me) to the appropriate units in your office to assure that no records related to this request are destroyed. Please advise me of any destruction of records and include the date and authority for such destruction.

5.　　ITEMIZED INVENTORY:　Please provide a complete itemized inventory and detailed factual justification of total or partial denial of documents.　Specify the number of pages in each document and the total number of pages pertaining to this request.

The Victim was tried in the United States District Court for the Southern District of Texas under United States Federal law and convicted on three counts of killing in the furtherance of a continuing criminal enterprise, in addition to seven other counts that included conspiring to import over 1000 kilograms of marijuana and possession with intent to distribute over 1000 kilograms of marijuana. He was sentenced to death under 21 U.S.C. § 848. This provides, inter alia, that:

*When the attorney for the Government has filed a notice as required under subsection (h) of this section and the defendant is found guilty of or pleads guilty to an offense under subsection (e) of this section, the judge who presided at the trial or before whom the guilty plea was entered, or any other judge if the judge who presided at the trial or before whom the guilty plea was entered is unavailable, shall conduct a separate sentencing hearing to determine the punishment to be imposed. The hearing shall be conducted -*

*(A) before the jury which determined the defendant's guilt;*
*(B) before a jury impaneled for the purpose of the hearing if -*
*(i) the defendant was convicted upon a plea of guilty;*
*(ii) the defendant was convicted after a trial before the court sitting without a jury;*
*(iii) the jury which determined the defendant's guilt has been discharged for good cause; or*
*(iv) after initial imposition of a sentence under this section, redetermination of the sentence under this section is necessary; or*
*(C) before the court alone, upon the motion of the defendant and with the approval of the Government.*

In this case the Victim was sentenced to death by the jury that had convicted him.

At the punishment stage of his hearing evidence was introduced of four unadjudicated murders that the Victim was alleged to have committed in Mexico. In particular, the U.S. Government relied on the testimony of three accomplices in the killing, Customs Agents that it had sent to Mexico to conduct an investigation into the murders and pathologists.

Notice of the U.S. Government's intention to rely on evidence of four unadjudicated murders was given in advance of the trial. As a result at a pre-trial hearing, counsel for the Victim attempted unsuccessfully to exclude the evidence of the unadjudicated Mexican murders. His argument before the District Court consisted of the following points:

(a)     It was impossible for the defence to conduct a meaningful inquiry into the four separate murders that the Victim was alleged to have committed in Mexico.
(b)     The Victim had no protection against the suppression, fabrication, or destruction of exculpatory evidence by the Mexican authorities. Also, he had no right to compulsory process in Mexico to obtain the testimony of any favourable witnesses.
(c)     The United States Government on the other hand, has a treaty in effect with the Mexican Government entitling the former *inter alia*, to obtain evidence from the Mexican authorities.
(d)     Since the Victim did not have independent subpoena power in Mexico, he could not obtain a fundamentally fair punishment phase trial.

The Court of Appeals affirmed the conviction and sentence on direct appeal. The Supreme Court

denied the victim's petition for a writ of certiorari. Pursuant to 28 U.S.C. § 2255 which allows, inter alia, a prisoner to argue that a sentence is contrary to the Constitution, the Victim filed a motion to vacate his sentence. The Victim argued that the Government, by introducing the evidence of the four unadjudicated murders, violated his rights under the Due Process Clause of the United States Constitution because he did not have an opportunity to deny or explain the evidence. The District Court denied the motion as did the Court of Appeals. The Court of Appeals based its decision on the fact that the Government turned over to the Victim every document that it received from Mexico and had notified the Victim of its intention to rely on the unadjudicated murders at sentencing. It further noted that the Victim was provided with full pre-trial discovery of the evidence in the possession of the prosecution and had the opportunity to cross-examine all of the prosecution witnesses at trial. The Court of Appeals also denied the Victim's request for a certificate of appealability. The Supreme Court have now denied the Victim's petition for a writ of certiorari.

4.3     Right to Due Process of Law

The Complainant relies on the facts set out in paragraph 4.2 in relation to this complaint.

## 5.     ARTICLES OF THE AMERICAN DECLARATION OF THE RIGHTS AND DUTIES OF MAN THAT HAVE BEEN VIOLATED

5.1     Article I - Right to Life

*Every human being has the right to life, liberty and the security of his person.*

The guarantee of the right to life does not expressly provide for any limitation. On a straight reading of the text, it would seem that the death penalty constitutes a violation of the right to life. The case law of the IACHR has been to view the death penalty as an exception to the right to life contemplated by the drafters of the Declaration in 1948 (*See* e.g. **Roach and Pinkerton v US** (Resolution No. 3/87)). However, in the same case the IACHR also considered that this is not a static norm, and that its interpretation would evolve over time.

Given that this is not a static norm and the Victim is likely to become the first person executed by the Federal Government of the United States for over 35 years this may be an appropriate time for the IACHR to review this issue. In support of this submission the increasing trend for states to abolish the death penalty as a criminal penalty should be noted. According to the Secretary-General of the United Nations, the majority of Member States of the organization are abolitionist. A large majority of the Member States of the Organization of American States are abolitionist. Besides the abolitionist protocols adopted within the universal and regional systems, the exclusion of the death penalty by the Security Council when it established the *ad hoc* criminal tribunals as well as in the *Rome Statute of the International Criminal Court* stand out.

It should also be noted that there is nothing in the American Declaration - unlike the treaty norms interpreted by the IACHR, the Inter-American Court and the European Court of Human Rights - to indicate that the death penalty is recognized as an exception to the right to life. Exaggerated reliance on the *travaux préparatoires* of the American Declaration for the purposes of interpretation cannot have been the intent of its drafters, who desired an instrument that would evolve with the progressive development of human rights law.

Nevertheless, it now seems to be beyond debate that if the right to a fair trial is not respected in the strictest fashion where capital punishment is at issue, that there is a violation not only of the right to a fair trial but also of the right to life. This interpretation has been developed by the Human Rights Committee in views concerning petitions filed under the Optional Protocol to the International Covenant on Civil and Political Rights G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976. See: General Comment 6(16) of the Human Rights Committee, para. 7.

5.2  Article XVIII - Right to a Fair Trial

> *Every person may resort to the courts to ensure respect for his legal rights. There should likewise be available to him a simple procedure whereby the courts will protect him from acts of authority that, to his prejudice, violate any fundamental constitutional rights.*

It is the Complainants' submission that this Article of the American Declaration of the Rights and Duties of Man should be interpreted so that it bears a similar meaning to its counterpart articles providing a right to a fair trial in other international human rights instruments. That is because the IACHR has recognised that the American Declaration of the Rights and Duties of Man should be interpreted in accordance with customary international law (*See* e.g. **Roach and Pinkerton v US** (Resolution No. 3/87)). It is the Complainants submission that international human rights instruments are evidence of customary international law.

In particular it is submitted that the International Covenant on Civil and Political Rights, G.A. res. 2200A (XXI), 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171, *entered into force* Mar. 23, 1976 and the views of the Human Rights Committee interpreting the Covenant in communications filed under the Optional Protocol to the Covenant, as well as its general comments and concluding observations, the decisions of the Human Rights Committee interpreting the Covenant are of particular relevance. That is because the International Covenant on Civil and Political Rights represents the standards of in excess of 140 nations that have ratified the Covenant. It is also significant that the United States of America has ratified the International Covenant on Civil and Political Rights and must accept the standards of that Convention. Indeed the Inter American Court of Human Rights has recently confirmed that the guarantees contained in Article 14 of the Covenant concur with the principal international instruments on human rights (para 116, **Consultative Opinion** OC-16/99, 1 October 1999),

Article 14 of the International Covenant on Civil and Political Rights states, inter alia, that:

> *1. All persons shall be equal before the courts and tribunals. In the determination of any criminal charge against him, or of his rights and obligations in a suit at law, everyone shall be entitled to a fair and public hearing by a competent, independent and impartial tribunal established by law. ...*

> *2. Everyone charged with a criminal offence shall have the right to be presumed innocent until proved guilty according to law.*

> *3. In the determination of any criminal charge against him, everyone shall be entitled to the following minimum guarantees, in full equality:*
> > *(a) To be informed promptly and in detail in a language which he understands of the nature and cause of the charge against him;*
> > *(b) To have adequate time and facilities for the preparation of his defence and*

*to communicate with counsel of his own choosing;*
*(e) To examine, or have examined, the witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him; ...[1]*

It is the Complainants' submission that although the provisions of this Article are more specific than Article XVIII of the American Declaration of the Rights and Duties of Man, both Articles essentially guarantee a right to a fair trial and so the standards of justice embodied in them are essentially the same. Moreover, the provisions of *American Convention on Human Rights* correspond generally to the content of article 14 of the Covenant. Furthermore, article 14 of the Covenant has been recognized as a general statement of the right to a fair trial in such instruments as the statutes of the ad hoc international criminal tribunals, as well as in article 67 of the Rome Statute of the International Criminal Court.

The views of the United Nations Human Rights Committee show that a number of principles can be derived from this provision and other provisions of the International Covenant on Civil and Political Rights. Firstly it is clear that the highest standards of fairness must be applied in capital cases (*See* e.g. **Collins v Jamaica**, Communication No. 356/1989, U.N. Doc. CCPR/C/47/D/356/1989 (1993)). In particular "the provisions of the Covenant implies that 'the procedural guarantees therein must be observed, including the right to a fair hearing by an independent tribunal, the presumption of innocence, the minimum guarantees for the defence, and the right to a review by a higher tribunal" (*See* Id.). In addition the principle of "equality of arms" is an important element of the right to a fair trial protected by Article 14 (*See* e.g. **Grant v Jamaica**, Communication No. 353/1988, U.N. Doc. CCPR/C/50/D/353/1988 (1994) and **Gordon v Jamaica**, Communication No. 237/1987, U.N. Doc. CCPR/C/46/D/237/1987 (1992)).

The concept of "equality of arms" has been developed further in the jurisprudence considering the relevant articles of the European Convention on Human Rights, E.T.S. No. 5. Articles 6(1) and 6(3)(b) and (d) of this Convention state, inter alia, that:

*1.     In the determination of... any criminal charge against him, everyone is entitled to a fair and public hearing...by an independent and impartial tribunal...*

*3.     Everyone charged with a criminal offence has the following minimum rights: ...*
*(b)     to have adequate time and facilities for the preparation of his defence; ...*
*(d)     to examine or have examined witnesses against him and to obtain the*

---

[1]     The Complainants note that the United States has entered a reservation that:
*That the United States reserves the right, subject to its Constitutional constrains, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age.*
The United States has, however, entered no relevant reservation in relation to Article 14. The United States cannot intend that those facing capital trial should receive a less fair trial than those who face trial for lesser matters. As a consequence it is submitted that this reservation has no relevance when considering whether the standards contained in Article 14 have been breached.

> *attendance and examination of witnesses on his behalf under the same conditions as witnesses against him;*

Article 6 of the European Convention is similar in content to article 8 of the American Convention and article 14 of the Covenant, and the interpretation of the right to a fair trial developed by the Strasbourg organs is generally recognized as authoritative. The case law of the European Commission and the European Court has been cited frequently by the Inter-American Court.

In **Jespers v. Belgium** 27 DR 61 (1981) the European Commission for Human Rights made the point that the "equality of arms" principle applies both at the trial of accused and when he is being sentenced. The court stated that:

> *The equality of arms principle imposes on prosecuting and investigating authorities an obligation to disclose any material in their possession or to which they could gain access, which may assist the accused in exonerating himself or in <u>obtaining a reduction in sentence. This principle extends to material which might undermine the credibility of a prosecution witness</u>* [emphasis added].

In **Barberà, Messegné and Jabardo v. Spain** 11 EHRR 360, the European Court of Human Rights elaborated on what exactly is meant by 6(1) and 6(3):

> *<u>Taken together they require the Contracting State to take positive steps in particular</u> to inform the accused promptly of the nature and cause of the accusation against him, to allow him adequate time and facilities for the preparation of his defence, to secure him the right to defend himself in person or with legal assistance and <u>to enable him to examine or have examined witnesses against him and to obtain the attendance and examination of witnesses on his behalf under the same conditions as witnesses against him.</u> The latter right not only entails equal treatment of the prosecution and defence in this matter but also means that the hearing of witnesses must in general be adversarial* [emphasis added].

It is the Complainants' submission that the above judgements show clearly that the principle of "equality of arms" applies to the sentencing phase of a criminal trial as well as to the guilt phase and that it entitles a defendant to the same rights to call witnesses as the prosecution at this phase. In addition "equality of arms" requires the prosecuting authorities to supply the defence with material that might undermine prosecution witnesses.

It is the Complainants' submission that the Victim's right to a fair trial was violated by the introduction evidence of unadjudicated crimes after the Victim was convicted at the stage when the jury was required to determine the imposition of the death penalty. That is because the reliability of the allegations have not been proved at a criminal trial at which rules of evidence ensure the safety of the conviction. This is because 21 U.S.C. § 848 provides, inter alia, that:

> *Any other information relevant to such mitigating or aggravating factors may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.*

This problem has been recognised by jurists in the United States. For example in **Williams v Lynagh**, 484 U.S. 935 (1987) at 938 Justice Marshall wrote:

> *This Court has repeatedly stressed that because the death penalty is qualitatively different from any other criminal punishment, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case. In my view, imposition of the death penalty in reliance on mere allegations of criminal behavior fails to comport with the constitutional requirement of reliability. A conviction signals that the underlying criminal behavior has been proved beyond a reasonable doubt to the satisfaction of an unbiased jury in conformance with constitutional safeguards. The testimony on which the State relied in this case, by contrast, carries with it no similar indicia of reliability.*

In addition, the jury had clearly already decided that the Victim was guilty of serious offences at the time that they were required to consider the evidence regarding unadjudicated crimes. In those circumstances it is submitted that it is impossible for the jury to assess fairly the evidence of the unadjudicated crimes. The jury is inevitably likely to favour evidence presented by the prosecution after they have already determined guilt.

The impossibility of the jury approaching the evidence of unadjudicated convictions in an unbiased manner is contrary to the principle of trial by an impartial tribunal and the principle of equality of arms. As such the Victim's right to a fair trial as guaranteed by Article XVIII of the American Declaration of the Rights and Duties of Man was violated.

If the Complainants are wrong and the right to a fair trial does not prevent the introduction of unadjudicated offences at the sentencing stage of a criminal trial, it is still the Complainants' submission that in this particular case, the Victim's ability to obtain the attendance and examination of witnesses on his behalf was not under the same conditions as witnesses against him. Similarly, the Victim could not obtain exculpatory evidence under the same conditions that evidence incriminating him was obtained by the prosecution. There are two reasons for this fundamental unfairness.

Firstly, there exists between the United States and Mexico the Treaty on Cooperation Between the United States of America and The United Mexican States for Mutual Legal Assistance, Dec. 9, 1987, U.S.-Mex., 27 I.L.M. 447. This treaty obliges the parties to provide each other *inter alia* with assistance in criminal matters including the taking of testimony or statements of persons, the provision of documents, records and evidence, and the execution of legal requests for searches and seizures (Article 1(4)). Article 1(5) expressly excludes the possibility of the Defendant being accorded the same facilities as the State party. It states as follows:

> *This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.*

This shows clearly that the state and the victim did not have equality of arms.

Moreover, to date, there does not exist a letters rogatory process between the United States and Mexico in relation to criminal matters. It is particularly noteworthy that the Inter-American Convention on Letters Rogatory allows states to apply the Convention in criminal matters but neither the United States or Mexico have done this.

The Court of Appeals in denying the Victim's motion alleging a violation of the Due Process clause of the Constitution, relied on the inability of the Victim to show that he was prejudiced as he was unable to show that there were witnesses or evidence that he was unable to call. It is the Complainant's submission that the Court of Appeals erred as it failed to realize that because the Victim could not himself conduct a meaningful investigation, he was prevented from identifying with particularity any favourable evidence. That is essentially the inherent unfairness of the Victim's situation. As was noted by Rovner J (dissenting) in the United States case of **Bracy v. Gramley**, 81 F. 3d 684, 697 (7th Cir. 1995) by refusing to give petitioners "every opportunity" to prove that their allegations were more than mere speculation, the majority wanted to "have it both ways: we cannot criticize [the petitioners] for speculation and at the same time deprive them of the chance to render their theory anything more".

As a consequence of the Victim's inability to conduct his own meaningful investigation in Mexico and thus his inability to obtain favourable documentary evidence and the attendance and examination of witnesses on his behalf, he was unable to conduct any meaningful adversarial testing of the prosecution evidence.  As such his right to a fair trial as guaranteed by Article XVIII of the American Declaration of the Rights and Duties of Man was violated.

5.3     Article XXVI - Right to Due Process of Law

> *Every accused person is presumed to be innocent until proved guilty. Every person accused of an offence has the right to be given an impartial and public hearing, and to be tried by courts previously established in accordance with pre-existing laws, and not to receive cruel, infamous or unusual punishment.*

It is the Complainants' submission that the use of evidence of unadjudicated crimes at the sentencing phase violates this principle. As noted above, it is the Applicant's submission that a jury that has recently convicted a person of capital murder cannot be regarded as an impartial tribunal if it is subsequently asked to assess evidence of further crimes. As such his right to due process as guaranteed by Article XXVI of the American Declaration of the Rights and Duties of Man was violated.

6.    **NAMES AND TITLES OF PERSONS/AUTHORITIES WHO COMMITTED THE VIOLATIONS**

6.1    Janet Reno
       US Attorney General
       US Department of Justice
       950 Pennsylvania Avenue NW
       Washington
       DC 20530
6.2    Kathleen Hawk Sawyer
       Director
       Federal Bureau of Prisons
       320 First Street NW
       Washington
       DC 20534

7.    **WITNESSES TO THE VIOLATIONS**

7.1    Juan Raul Garza

7.2    Gregory W Wiercioch, the Victim's US Attorney in proceedings before the Supreme
Court

## 8.    DOCUMENTS/AFFIDAVITS

Petition for a writ of certiorari.

## 9.    DOMESTIC LEGAL REMEDIES PURSUED

The Victim has exhausted his appeal and habeas corpus rights.

## 10.    DOMESTIC LEGAL REMEDIES YET TO BE PURSUED

There are no further legal remedies available to the Victim that will allow him to raise the issues
raised in this complaint.

## 11.    COMPLAINANTS

| 11.1 | **Name** | Michael Mansfield, QC (representing the Human Rights Committee of the Bar of England and Wales) |
| 11.2 | **Occupation** | Queen's Counsel |
| 11.3 | **Address** | 14 Tooks Court, Cursitor Street, London, EC4A 1LB |
| 11.4 | **Telephone** | 44 171 405 8828 |
| 11.5 | **Facsimile** | 44 171 405 8828 |

_____
Signature

_____
Dated

| 11.1 | **Name** | John B. Quigley, AB, MA, LLB |
| 11.2 | **Occupation** | Professor of International Law |
| 11.3 | **Address** | The Ohio State University College of Law, Drinko Hall, 55 West 12th Street, Columbus, Ohio 43210 |
| 11.4 | **Telephone** | |
| 11.5 | **Facsimile** | |

_____
Signature

_____December 14, 1999_____
Dated

| 11.1 | **Name** | William A. Schabas |
| 11.2 | **Occupation** | Professor of International Human Rights Law, member of the |

| 11.3 | Address | Quebec Bar<br>University of Quebec at Montreal, CP 8888, Centre-Ville Station, Montreal, H3T 3C8 |
| 11.4 | Telephone | 514 987 3000, ext. 7096 |
| 11.5 | Facsimile | 514 987 4784 |

*Submitted with the* approval of Professor Schabas

Signature

Dated

| 11.1 | Name | Gregory W Weircioch |
| 11.2 | Occupation | Attorney |
| 11.3 | Address | 412 Main Street, Suite 1150, Houston, Texas 77002 |
| 11.4 | Telephone | (713) 222 7788 |
| 11.5 | Facsimile | (713) 222 0260 |

*See attached fax*

Signature

Dated

| 11.1 | Name | Hugh Southey (representing the Human Rights Committee of the Bar of England and Wales) |
| 11.2 | Occupation | Barrister |
| 11.3 | Address | 14 Tooks Court, Cursitor Street, London, EC4A 1LB |
| 11.4 | Telephone | 44 171 405 8828 |
| 11.5 | Facsimile | 44 171 405 8828 |

Signature

15 December 1999

Dated

| 11.1 | Name | Mark Norman |
| 11.2 | Occupation | Solicitor of the Supreme Court of England and Wales |
| 11.3 | Address | Lovell White Durrant, 65 Holborn Viaduct, London, EC1A 2DY |
| 11.4 | Telephone | 44 171 236 0066 |
| 11.5 | Facsimile | 44 171 248 4212 |

Signature

15 December 1988.

Dated

15 December 1988.

*Greg Wiercioch*

Signature

*December 14, 1999*

Dated

11.1  **Name**        Hugh Southey
11.2  **Occupation**  Barrister
11.3  **Address**     14 Tooks Court, Cursitor Street, London, EC4A 1LB
11.4  **Telephone**   44 171 405 8828
11.5  **Facsimile**   44 171 405 8828

_____

Signature

_____

Dated

11.1  **Name**        Mark Norman
11.2  **Occupation**  Solicitor of the Supreme Court of England and Wales
11.3  **Address**     Lovell White Durrant, 65 Holborn Viaduct, London, EC1A 2DY
11.4  **Telephone**   44 171 236 0066
11.5  **Facsimile**   44 171 248 4212

_____

Signature

_____

Dated

INTER - AMERICAN    JMMISSION ON HUMAN RIGH
COMISION INTERAM. .ICANA DE DERECHOS HUMANUS
COMISSÃO INTERAMERICANA DE DIREITOS HUMANOS
COMMISSION INTERAMÉRICAINE DES DROITS DE L'HOMME



## ORGANIZATION OF AMERICAN STATES
WASHINGTON,D.C. 2 0 0 0 6 U.S.A.

January 27, 2000

Ref:  Case No. 12.243, United States of America
      Juan Raul Garza

Dear Mr. Southey:

I wish to acknowledge receipt of your recent letter of December 14, 1999, with regard to the situation of Juan Raul Garza in the United States of America.

The Inter-American Commission on Human Rights, in a note of January 25, 2000, has advised the Government of that country of the situation set forth in your communication and has requested information with regard to the same. The Commission has also requested, pursuant to Article 29(2) of its Regulations, that the United States of America take all necessary measures to preserve Mr. Garza's life and physical integrity so as not to hinder the processing of his case before the Inter-American system. This request was made on the basis that, if the Government of the United States of America were to execute Mr. Garza before the Commission has an opportunity to examine his case, any eventual decision would be rendered moot in respect of the efficacy of potential remedies, and irreparable harm would be caused to Mr. Garza. As soon as we receive a response from the Government, we will send you the pertinent parts of that reply for your comments.

In response to your request for an oral hearing of this matter at the Commission's next session, the Commission has decided not to schedule a hearing in this matter at the present time.

Tooks Court Chambers
Attn: Hugh Southey
14 Tooks Ct.
Cursitor St.
London EC4A 1LB
United Kingdom

The fact-findi.    .ocess may take some time; howe  ., we will inform you opportunely of any new developments. Meanwhile, any additional information that you might receive should be forwarded to the Commission making reference to the name of the victim and the number of the case as noted above. In this respect, the Commission requests that you provide it with a copy of the transcript from Mr. Garza's sentencing hearing before the United State's District Court for the Southern District of Florida, a copy of Mr. Garza's warrant of execution, and copies of the reasons for decision, if any, of the District Court and the U.S. Court of Appeals denying Mr. Garza's motion to vacate his sentence.

Sincerely yours,

Jorge E. Taiana
Executive Secretary

INTER - AMERICAN COMMISSION ON HUMAN RIGH
COMISION INTERAN    ICANA DE DERECHOS HUMANOS
COMISSÃO INTERAMERICANA DE DIREITOS HUMANOS
COMMISSION INTERAMÉRICAINE DES DROITS DE L'HOMME



---

**ORGANIZATION OF AMERICAN STATES**
WASHINGTON, D.C. 2 0 0 0 6 U.S.A.

May 8, 2000

Ref.    Case No. 12.243 (United States of America)
        Juan Raul Garza

Dear Sirs:

In the name of the Inter-American Commission on Human Rights, I wish to inform you that the Commission, in a note dated May 3, 2000, has reiterated its request to the Government of the United states of America for information on the case cited above. You will be informed of any reply that the Government might make.

Sincerely yours,

David J. Padilla
Assistant Executive Secretary

TOOKS COURT CHAMBERS
Attn.: Mr. Hugh Southey
14 Tooks Court, Cursitor Street
London EC4A 1LB
Fax: 171-405-6680

TOTAL P. 02

INTER - AMERICA   COMMISSION ON HUMAN RIG...S
COMISION INTERAMERICANA DE DERECHOS HUMANOS
COMISSÃO INTERAMERICANA DE DIREITOS HUMANOS
COMMISSION INTERAMÉRICAINE DES DROITS DE L'HOMME



**ORGANIZATION OF AMERICAN STATES**
WASHINGTON, D.C. 2 0 0 0 6 U.S.A.

May 31, 2000

Ref.    Case No. 12.243 (Juan Raul Garza)
        United States of America

Dear Sirs:

In the name of the Inter-American Commission on Human Rights, I wish to acknowledge receipt of the communication dated May 26, 1999 from Greg Wiercioch, the Texas solicitor for the alleged victim in the case cited above, indicating that Mr. Garza's execution has been scheduled for August 5, 2000.

The Commission, in a note dated May 31, 2000, has transmitted the pertinent parts of this information to the Government of the United States.   The Commission also reiterated its call for an urgent response to its request for precautionary measures, as contained in the letter to the State dated January 27, 2000, by which the Commission transmitted the pertinent parts of the petition in this matter.  You will be informed of any reply that the Government might make.

In the event you should obtain new information regarding this case, I would be grateful if you would send it to us.

Sincerely yours,

Jorge E. Taiana
Executive Secretary

TOOKS COURT CHAMBERS
Attn: Hugh Southey
14 Tooks Court, Cursitor Street
London EC4A 1LB

C: Greg Wiercioch
Texas Defender Service

Main Topic

EP Resolution - USA (death penalty)

Category : Americas\USA\European Parliament

----------------------------------------------------------------------------------------------------------------------------

13 April 2000

Human rights: Death penalty in the United States

B5-0341, 0354, 0359, 0370 and 0376/2000

European Parliament resolution on the abolition of the death penalty in the

United States

The European Parliament,

A. having regard to its previous resolutions on the death penalty,

B. welcoming the worldwide trend towards the abolition of the death

penalty,

C. welcoming the appeal by the Sant'Egidio Community for a moratorium on

the death penalty by all the world's governments by the end of 2000,

D. dismayed that a date may soon be set for Juan Garza's execution in the

USA, the first execution of a prisoner under US federal law since 1963,

E. noting with interest that the Governor of Illinois has imposed a

moratorium on executions owing to serious concern about the fairness of

capital convictions in his State,

F. noting reports that the US Justice Department is conducting a review

into race and the federal death penalty and urging that the methodology

and scope of this study be made public,

G. whereas 98 persons under sentence of death were executed in the United States in 1999,

H. disturbed by Amnesty International figures which estimate that only China, the Democratic Republic of Congo and Iraq carried out more judicial executions than the United States in 1998,

I. noting that even the US Attorney General Janet Reno admits that no study so far has been able to prove the dissuasive effects of the death penalty,

1. Reiterates its call for the abolition of capital punishment and the immediate imposition of a moratorium in countries where capital punishment still exists;

2. Urges the US Government to comply with the request made by the Inter-American Commission on Human Rights on 27 January 2000 that the execution should not proceed before the Commission has examined and ruled on the case;

3. Urges President Clinton to grant clemency to Juan Raul Garza and to impose an immediate moratorium on federal executions, as a first step toward the universal abolition of the death penalty in the United States;

4. Calls on all candidates running in the current presidential elections also to endorse a moratorium on the death penalty and support the universal abolition of capital punishment;

5. Instructs its President to forward this resolution to the Council, the Commission, President Clinton, Vice-President Gore and Governor Bush, the Inter-American Commission on Human Rights and the President of the UN Commission on Human Rights.

EU Assoc on 14/04/2000 at 14:28