United States District Court
Southern District of Texas
FILED

DEC 0 8 2000

Michael N. Milby
Clerk of Court

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Docket No. B-97-273 |
| | § | |
| JUAN RAUL GARZA | § | |

## MEMORANDUM IN SUPPORT OF EXPEDITED MOTION TO PRECLUDE AN AUTOPSY OF JUAN RAUL GARZA

Juan Raul Garza respectfully submits this memorandum in support of his expedited motion to preclude an autopsy from being conducted on his remains following his scheduled execution on December 12, 2000. The law of Texas governs the permissibility of an autopsy of Juan Raul Garza's remains, and no provision thereunder provides for even the possibility of an autopsy of a lawfully executed prisoner. Moreover, Juan Raul Garza opposes the performance of an autopsy on moral and religious grounds. Juan Raul Garza accordingly seeks a ruling that an autopsy may not be performed on his remains under controlling Texas law and over his religious and moral objections.

### BACKGROUND

Juan Raul Garza was sentenced to death by this Court in 1993 and is scheduled to be executed on December 12, 2000 by lethal injection. His scheduled execution will take place on the grounds of the United States Penitentiary-Terre Haute ("USP-Terre Haute"), a federal facility constructed for the purpose of

\\\DC - 90334/9064 - #1227121 v2

implementing federal death sentences. The implementation of the death sentence will be witnessed by numerous individuals, including a United States marshal and the warden of USP-Terre Haute.

On December 7, 2000, undersigned counsel Greg Wiercioch spoke with Craig Simmons, Legal Counsel at USP-Terre Haute. Mr. Simmons advised Mr. Wiercioch that it is the "official policy" of the Federal Bureau of Prisons ("FBOP") that following each execution of a federal prisoner, an autopsy will be performed to protect the FBOP against civil liability. Moreover, Dr. Susan Amos, the coroner for Vigo County, the county in the State of Indiana in which USP-Terre Haute is located, has previously suggested an intention to direct autopsies on the remains of federal prisoners executed at USP-Terre Haute. See Mike Ricketts, Coroner says autopsy will be done despite death-row inmate's request, Terre Haute (Indiana) Tribune-Star, June 25, 2000, attached hereto as Exhibit 1.

Under controlling Texas law, however, there is simply no statutory authority for the performance of an autopsy following a lawful execution. Moreover, Juan Raul Garza objects on moral and religious grounds to the performance of an autopsy following his scheduled execution. Accordingly, this Court should grant the present Motion and enter an Order precluding the performance of an autopsy on Juan Raul Garza's remains.

## ARGUMENT

I.  PURSUANT TO FEDERAL STATUTE, TEXAS LAW PRESCRIBES THE  PROCEDURES GOVERNING THE IMPLEMENTATION OF JUAN RAUL GARZA'S DEATH SENTENCE.

2

According to the federal death penalty statute, a federal death sentence is to be implemented in accordance with the provisions of the law of the State in which the sentence was entered against the defendant. See 18 U.S.C. § 3596 ( "[T]he Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of *the State in which the sentence is imposed*." (emphasis added)). The statute's legislative history is unmistakably clear that the procedures to be followed are those "prescribed by the law of the State in which the sentence *was* imposed." H.R. Rep. No. 103-467, at 9-10 (1994). In United States v. Hammer, No. 4:CR-96-239 (M.D. Pa. Oct. 24, 2000), the court interpreted the federal death penalty statute and its legislative history on this issue and found controlling the law of the state in which the death sentence was originally imposed. See id., slip op. at 4-5 (explaining that the "term 'imposed' throughout the federal death penalty statute relates to the adjudication by the court and not the actual infliction of the punishment" and granting motion to preclude autopsy), attached hereto as Exhibit 2.

Because Juan Raul Garza's death sentence was entered by this Court, Texas law governs the manner by which Juan Raul Garza's scheduled execution may be implemented.

## II. UNDER CONTROLLING TEXAS LAW, THERE IS NO AUTHORITY FOR THE PERFORMANCE OF AN AUTOPSY FOLLOWING A LAWFUL EXECUTION.

3

Texas law clearly and explicitly withholds any authority or obligation for a medical examiner or justice of the peace to order the performance of an autopsy following the execution of a death sentence. Article 49.25(6)(a)(2) of the Texas Code of Criminal Procedure describes the circumstances in which a medical examiner is required to investigate unnatural deaths as follows:

> Any medical examiner, or his duly authorized deputy, shall be authorized, and it shall be his duty, to hold inquests with or without a jury within his county . . . [w]hen any person is killed; or from any cause dies an unnatural death, *except under sentence of the law.*

Tex. Code Crim. Proc. art. 49.25(6)(a)(2) (emphasis added). Similarly, Article 49.18 of the Texas Code of Criminal Procedure states that the obligation of a justice of the peace to investigate prisoners' deaths "does not apply to a death that occurs . . . under circumstances described by Section 501.055(b) of the Government Code." Tex. Code Crim. Proc. art. 49.18. Section 501.055(b) of the Texas Government Code precludes investigation into the cause of death when an inmate "is lawfully executed." Tex. Gov't Code § 501.055(b)(2).

Moreover, Article 43.25 of the Texas Code of Criminal Procedure, which governs the implementation of a death sentence, states that "[t]he body of a convict who has been legally executed shall be embalmed immediately" and delivered to a "relative or bona fide friend" upon request "within forty-eight hours after execution." Tex. Code Crim. Proc. art. 43.25. The Texas procedures delineated in that Article do not mention, much less permit, the performance of an autopsy after the implementation of a death sentence.

4

Thus, under governing Texas law, there is no authority for the performance of an autopsy following Juan Raul Garza's scheduled execution.

### III. EVEN IF AN AUTOPSY WERE OTHERWISE PERMISSIBLE, JUAN RAUL GARZA'S RELIGIOUS AND MORAL OBJECTIONS, IN ADDITION TO HIS STATED WILLINGNESS TO GIVE A SWORN STATEMENT PRIOR TO HIS EXECUTION, PRECLUDE THE PERFORMANCE OF AN AUTOPSY.

Juan Raul Garza has deep-seated religious and moral objections to the performance of an autopsy on his remains following his scheduled execution. See Declaration of Juan Raul Garza ¶ 2 [hereinafter "Garza Declaration"], attached hereto as Exhibit 3. Given the sincerity and depth of Juan Raul Garza's religious and moral opposition, no government entity that may potentially request an autopsy of Juan Raul Garza's remains can demonstrate an interest sufficient to overcome Juan Raul Garza's countervailing interest in precluding the performance of an autopsy.

First, although the FBOP's official position of seeking autopsies following federal executions suggests that such action is necessary to protect itself from accusations that federal prisoners were physically abused prior to their executions, this rationale is inapplicable in the present case. Juan Raul Garza has explicitly indicated his willingness to make a statement prior to his execution that he has suffered no physical abuse from USP-Terre Haute personnel. See Garza Declaration at ¶ 4, attached hereto as Exhibit 3. This statement, which will be made under oath and in the presence of witnesses, should allay any government

5

\\\DC - 90334/9064 - #1227121 v2

fears of possible recriminations regarding Juan Raul Garza's physical condition prior to his execution. As such, the federal government's rationale for an autopsy is inapplicable and is greatly overshadowed by Juan Raul Garza's sincerely held moral and religious beliefs. See Hammer, slip op. at 14 (finding that prisoner's moral and religious opposition outweighed any government interest in performing an autopsy as a means to protect against civil liability), attached hereto as Exhibit 2.

Moreover, as the Middle District of Pennsylvania recently recognized in granting a similar request to preclude the performance of an autopsy, "[n]either Vigo County nor the State of Indiana has any valid interest in conducting an autopsy on a federal inmate." Id., slip op. at 13-14, attached hereto as Exhibit 2. Accordingly, like the federal government, the local Indiana authorities should be precluded from performing an autopsy in the event of Juan Raul Garza's scheduled execution.

Thus, Juan Raul Garza's sincere moral and religious objections to the performance of an autopsy clearly outweigh any potential government arguments regarding the need for such an autopsy.

## CONCLUSION

For these reasons, Juan Raul Garza respectfully requests that this Court grant his Expedited Motion to Preclude an Autopsy of Juan Raul Garza and enter

6

\\\DC - 90334/9064 - #1227121 v2

an order precluding the performance of an autopsy on his remains following his scheduled execution.

Respectfully submitted,

Gregory Wiercioch
Elizabeth Detweiler
Texas Defender Service
412 Main Street, Suite 1150
Houston, Texas 77002
TEL (713) 222-7788
FAX (713) 222-0260

Counsel for Juan Raul Garza

Dated: December 7, 2000

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of December 2000, a true and correct copy of the foregoing Memorandum in Support of Expedited Motion to Preclude an Autopsy of Juan Raul Garza was served upon opposing counsel by depositing it with Federal Express for next morning delivery to:

Ms. Paula C. Offenhauser
Assistant United States Attorney
c/o United States Marshals Service
515 Rusk Street
Houston, Texas 77002

7





Sunday
Jun 25, 2000
08:54 AM

Top Stories

Sports

Valley Life

Letters

Opinion

Columns

School Zone

Business

- Calendar

Classified

Obituaries

Library

Sincerely
Yours

Software
Store

About
Tribune Star

# Coroner says autopsy will be done despite death-row inmate's request

by Mike Ricketts

A condemned killer on federal death row in Terre Haute who wants to forego any further appeals and be executed also has asked that officials not conduct an autopsy on his body.

David Paul Hammer, convicted and sentenced to death for killing a fellow inmate in another federal prison, awaits an answer from the courts on his request to be executed.

His second request, though, might have been answered Friday, when Vigo County Coroner Dr. Susan Amos said autopsies will be conducted on prisoners executed at the facility south of Terre Haute.

Scott Wolfson, Bureau of Prisons spokesman, said prison officials aren't requesting an autopsy, but the final decision is up to Amos.

Hammer said Amos hadn't responded to several written requests of whether she will order an autopsy.

However, she told the Tribune-Star on Friday that an autopsy will be conducted on Hammer and any other person who dies while incarcerated.

Although Hammer said the medical procedure is against his religious beliefs, Amos said Dr. Roland Kohr, who conducts autopsies for the county, will take pains during the process to meet certain religious requirements.

Autopsies are also performed on state death row inmates who are executed at Michigan City, said Pam Pattison,

Have a suggestion?
Fill out our survey!

1997-2000 ©Tribune-Star
Publishing Co. Inc.
Contact Internet Services with
questions.

De   tment of Correction
sp.  .swoman. That decision is part of
Department of Correction protocol.

An autopsy can benefit the inmate's
family by making relatives aware of any
hereditary diseases, such as cancer or
heart problems, that the inmate might
have had, Amos said. The procedure
also deters guards from unnecessary
beatings or physical abuse of a man
they know is going to die anyway, Amos
added.

In addition to being against his religious
and moral beliefs, an autopsy is an
unnecessary cost to taxpayers, Hammer
said.

The coroner disagreed, however, saying
to perform an autopsy in some cases
could save taxpayers money in the long
run if an inmate's family files a lawsuit
claiming the prisoner was abused while
incarcerated. It costs about $650 for an
autopsy.

Hammer won't be the first inmate to be
executed by the federal government.
When executed on Aug. 5, Juan Raul
Garza will become the first federal
prisoner executed since 1963. He was
convicted in Texas in 1993 of three
murders while operating as marijuana
smuggler.

If the courts determine Hammer can ask
to forego further appeals, he could
become the second execution to take
place in the $475,000 death chamber at
the penitentiary on U.S. 63.

In addition to Garza and Hammer, there
are 20 other prisoners being held at the
Special Confinement Unit in Terre
Haute, awaiting executions. They
include Timothy McVeigh, who planted
the bomb in the Oklahoma City federal
building that killed 168 people.

Updated 6/24/2000

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA :

v.                         :   No. 4:CR-96-239

DAVID PAUL HAMMER,         :   (Judge Muir)

FILED
WILLIAMSPORT PA

OCT 24 2000

ANDREA, CLERK
Deputy Clerk

## ORDER

October 24, 2000

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

On November 4, 1998, this court sentenced David Paul Hammer to die by lethal injection for the first degree murder of Andrew Marti. On November 12, 1998, Mr. Hammer appealed that sentence to the Court of Appeals for this circuit. By opinion of August 31, 2000, the Court of Appeals dismissed Mr. Hammer's appeal. and remanded the case to this court "to fix an early new date for the implementation of the sentence of death." United States vs. Hammer, ___F.3d___, 2000 WL 1234611, at *8 (3d Cir. (Pa.) August 31, 2000)(No. 98-9011). On September 20, 2000, we received a memorandum from the government regarding the date of the execution. On September 21, 2000, we received a certified copy of the Court of Appeals' judgment in lieu of a formal mandate.

By order of September 21, 2000, we complied with the direction of the Court of Appeals by issuing an order setting November 15, 2000, as the date for the implementation of the sentence of death. Mr. Hammer is incarcerated at the United States Penitentiary, Terre Haute, Indiana ("USP-Terre Haute"), and the execution will take place at that facility. Terre Haute is located

in Vigo County, Indiana.

After we issued the order on September 21, 2000, setting November 15, 2000, as the date for the implementation of the sentence of death, we received on September 21, 2000, a document from Mr. Hammer entitled "Pro Se Defendant's Response to Government's Memorandum on Setting Execution Date." In that document Mr. Hammer requests that the execution be carried out between 10:00 a.m. and 4:00 p.m. and that he be provided with 30 days' notice of the tentative time selected for conducting the execution.

By order of September 22, 2000, we directed the government to file a response to Mr. Hammer's requests. On October 10, 2000, the government filed a memorandum regarding the setting of a particular time frame for the execution. On October 11, 2000, at 4:08 p.m., the Clerk of Court was advised by Mr. Hammer through the law office of stand-by counsel, Ronald C. Travis, that he would not be filing a reply memorandum. On October 5, 2000, Mr. Hammer filed a motion entitled "Pro Se Motion to Preclude Autopsy of David Paul Hammer" and brief in support thereof. Mr. Hammer also filed a motion for expedited briefing. By order of October 6, 2000, we authorized the government to file an expedited brief in opposition. We also authorized the Coroner of Vigo County, Indiana, to file a brief in opposition by October 18, 2000. On October 11, 2000, the government[1] filed a brief in which it argues that we do not have

---

[1] Throughout this order we will use the word "government" to refer to the federal government.

2

jurisdiction to act on Mr. Hammer's motion to preclude an autopsy. On October 16, 2000, Mr. Hammer filed a reply brief. On October 18, 2000, Assistant United States Attorney Frederick E. Martin filed a document entitled "Government's Supplemental Response to Order of October 6, 2000" and the Coroner of Vigo County, Indiana, filed a brief in opposition to Mr. Hammer's motion to preclude an autopsy. The government also filed a declaration under penalty of perjury of Harry G. Lappin, Warden of USP-Terre Haute, and Vigo County filed an affidavit of Dr. Susan S. Amos, the Coroner of Vigo County. On October 20, 2000, Mr. Hammer responded by filing reply briefs, exhibits and his own declaration under penalty of perjury relating to his sincerely held religious beliefs opposing autopsies. Therefore, both issues -- whether we should set a time frame or a specific time of day for the execution to take place and whether we should preclude an autopsy -- are ripe for disposition.

We will first respond to a footnote in the government's memorandum filed on October 10, 2000, regarding the setting of a particular time frame for the execution. That footnote states in relevant part that "the United States does not believe that this Court is the appropriate forum for considering all claims by Hammer regarding the details of his confinement or proposed execution in Indiana." We reject that position in part. This court is the appropriate forum for considering all claims of Mr. Hammer regarding the details of the scheduled execution in Indiana. It is clear also that the sentence of death must be implemented in a manner consistent with the law of the Commonwealth of Pennsylvania.

3

18 U.S.C. § 3596; see also H.R. Report No. 467, 103rd Cong., 2nd Sess. 1994, 1994 WL 107578 (Leg. Hist.).

Section 3596 entitled "Implementation of a sentence of death" states in relevant part as follows:

> When the sentence is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise implementation of the sentence in the manner prescribed by the law of the State in which the sentence is imposed. If the law of the State does not provide for implementation of a sentence of death, the court shall designate another State, the law of which does provide for the implementation of a sentence of death, and the sentence shall be implemented in that latter State in the manner prescribed by such law.[2]

The term "imposed" throughout the federal death penalty statute relates to the adjudication by the court and not the actual infliction of the punishment. See, e.g., 18 U.S.C. § 3595(a) and (c) ("(a) Appeal.-- In a case in which a sentence of death is imposed, the sentence shall be subject to review by the court of appeals upon appeal by the defendant. . . . (c) Decision and disposition. -- (1) The court of appeals shall address all substantive and procedural issues raised on the appeal of a sentence of death, and shall consider whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor . . . (2) Whenever, the court of appeals finds

---

[2] Section 3597 entitled "Use of State Facilities" provides in relevant part as follows:

> (a) In general. -- A United States marshal charged with supervising the implementation of a sentence of death may use appropriate State or local facilities for the purpose, may use the services of an appropriate State or local official or of a person such an official employs for the purpose, and shall pay the costs thereof in an amount approved by the Attorney General.

4

that -- (A) the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; . . . .")(emphasis added). Furthermore, the term "imposed" is commonly used in legal opinions with respect to the court's adjudication of punishment. In contrast with respect to the actual infliction of the punishment the federal death penalty statute uses the term "implementation." "Implement" is defined as "to give practical effect to and ensure of actual fulfillment by concrete measures." Webster's Third New International Dictionary (1961). "Implementation" is defined as "the act of implementing or the state of being implemented." Id. The implementation of the death sentence involves a process which includes more than just the method of execution utilized. Congress was no doubt aware of the usage of the terms "imposed" and "implementation" when it passed· the federal death penalty statute.

House of Representatives Report 467 of the 103rd Congress in the section-by-section analysis of the statute states that § 3596 "provides that when a sentence of death is to be implemented, the Attorney General shall release the person sentenced to death to the custody of a United States marshal, who shall supervise· the implementation of the death sentence in the manner prescribed by the law of the State in which the sentence was imposed." (emphasis added). This legislative history reveals that the "is" in the statute in fact means "was."

The sentence of death was imposed on Mr. Hammer in the Commonwealth of Pennsylvania on November 4, 1998, and thus the law

5

of Pennsylvania relating to the implementation of a death sentence applies, including the method of execution and the time of execution.

The government states in its memorandum that it has no objection to this court authorizing that the execution not take place before 7:00 a.m. on November 15, 2000. The government is required to comply with the federal death penalty statute.[3]

We will not set a time frame or a specific time of day because (1) the federal death penalty statute does not direct the court to do so, (2) the government is required to comply with the federal death penalty statute, and (3) the Court of Appeals only specified that we "fix an early new date" for the execution.

We will now address Mr. Hammer's motion to preclude an autopsy. The government argues that once Mr. Hammer is pronounced dead by medical personnel we have no further interest in what occurs in Indiana. The government also argues that we should transfer Mr. Hammer's request to the United States District Court for the Southern District of Indiana because of that court's greater familiarity with Indiana law and to promote consistency or uniformity in the implementation of death sentences imposed by district courts in other states. The government contends that uniformity would be promoted by having the federal district court in Indiana decide all issues regarding the implementation of death

---

[3] It has come to the court's attention that the time of executions in the Commonwealth of Pennsylvania is 10:00 p.m. This conclusion is based on a review of materials received from the Federal Judicial Center and has not been verified although an attempt to do so was made by way of a Westlaw search.

6

sentences.

The states that still have death penalty statutes are not uniform in the implementation of death sentences, including the method of execution[4] and the time of execution.[5]  It would be preferable to have uniformity in the implementation of federal death sentences.  However, uniformity is contrary to the process which Congress devised.

During the 104th Congress, legislation was introduced to amend that process to achieve such uniformity.  Specifically, Representative McCollum of Florida introduced H.R. 2359 which would have amended 18 U.S.C. § 3596 to provide that "the Attorney General will proscribe by regulation a uniform method of execution for any person sentenced to death in federal court."  Congressional Testimony, Subcommittee on Crime of the House Committee on the Judiciary, September 28, 1995, 1995 WL 10731955.  The Subcommittee received written testimony from Assistant Attorney General Andrew Fois regarding the proposed legislation as follows:

---

[4]    See Kenneth Williams, The Deregulation of the Death Penalty, 40 Santa Clara L. Rev. 677, 697 (2000)("There are five execution methods presently employed in the United States: electrocution, lethal gas, hanging, firing squad, and lethal injection.").

[5]    The materials received from the Federal Judicial Center reveal that the time of executions is 12:01 a.m. in Alabama, California, Illinois, Indiana, Kentucky, Missouri, Montana, Nevada, Oklahoma, Oregon, Washington and Wyoming; 12:01 - 3:00 a.m. in Delaware; 12:05 a.m. in Utah; 1:00 a.m. in Tennessee; 2:00 a.m. in North Carolina; 8:00 a.m. in Idaho; 10:00 a.m. in Nebraska; 3:00 p.m. in Arizona; 6:00 p.m. in Florida, Mississippi, South Carolina and Texas; 6:00 p.m. - 11:59 p.m. in Louisiana; 7:00 p.m. in Georgia; 7:00 p.m. - 9:00 p.m. in Arkansas; 9:00 p.m. in Virginia; and 11:00 p.m. in Maryland.

7

> H.R. 2359 would allow Federal executions to be
> carried out at Federal facilities pursuant to
> uniform Federal regulations.  The Department
> strongly supports this proposal.  This position
> has previously been taken by the Administration
> and was detailed in the June 13, 1994, letter
> from the Attorney General to the House and Senate
> Conference Committee, detailing the Administration's
> views on various sections of the Violent Crime
> Control and Law Enforcement Act of 1994 (VCCLEA).

> \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

> [T]he only execution for offenses under the
> VCCLEA[6] that could occur at Terre Haute are those for
> which lethal injection was permissible in the State in
> which the inmate was convicted.

> We believe that it is highly desirable to have
> a uniform system for implementing Federal death
> penalties in a Federal institution.

> From a policy as well as a practical perspective,
> it makes no sense to burden States with this
> clearly Federal responsibility, particularly
> when the Bureau of Prisons has a facility already
> built specifically for this task.  H.R. 2359 would
> remedy this situation by amending 18 U.S.C. § 3596
> to allow for the implementation of Federal death
> sentences pursuant to Federal regulations
> promulgated by the Attorney General.  In addition,
> 18 U.S.C. § 3597 would, (sic) be modified to provide
> for the use of Federal Facilities in carrying out
> Federal executions.

Congressional Testimony, Subcommittee on Crime of the House Committee on the Judiciary, September 28, 1995, 1995 WL 10731957. Kathleen M. Hawk, Director of the Federal Bureau of Prisons similarly testified before the Subcommittee.  Congressional Testimony, Subcommittee on Crime of the House Committee on the Judiciary, June 8, 1995, 1995 WL 352705 (F.D.C.H.).  The

---

[6] The federal death penalty statute was part of the Violent Crime Control and Law Enforcement Act of 1994 and is codified at 18 U.S.C. §§ 3591 through 3598.

Subcommittee also heard testimony in opposition to the legislation from Marvin D. Miller, Director of the National Association of Criminal Defense Lawyers. Id., September 28, 1995, 1995 WL 10732000.

The proposed legislation died in the 104th Congress. See H.R. Rep. No. 879, 104th Cong., 2nd Sess. 1997, 1997 WL. 9288 (Leg. Hist.) ("On September 28, 1996, the Subcommittee held a mark-up of H.R. 2359 and ordered it reported favorably to the full Committee, amended. No further action was taken on H.R. 2359 in the 104th Congress."). On March 17, 1997, Representative McCollum introduced in the 105th Congress, 1st Session, a similar bill, H.R. 1087, which was referred to the Committee on the Judiciary. The 105th Congress, however, did not pass that bill.[7]

---

[7] The text of that bill states in relevant part as follows:

A BILL

To clarify the method of execution of Federal prisoners.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

Section 1. IMPLEMENTATION OF SENTENCE OF DEATH.
   Subsection (a) of Section 3596 of title 18, United States Code, is amended to read as follows:
      ' (a) IN GENERAL - A person who is sentenced to death shall be committed to the custody of the Attorney General. At the time the sentence is to be carried out, it shall be implemented pursuant to regulations proscribed by the Attorney General.'.
Sec. 2. USE OF FEDERAL FACILITIES.
   Subsection (a) of section 3597 of title 18, United States Code, is amended to read as follows:
      ' (a) IN GENERAL - A United States marshal charged with supervising implementation of a sentence of death shall use the appropriate Federal facilities for this purpose.'.

9

A death sentence is to be implemented consistent with the law of the state in which the death sentence was imposed. The government's argument regarding uniformity has no merit in light of the language of the statute and its legislative history.

The government, Vigo County and Mr. Hammer appear to have overlooked the Pennsylvania procedures for the implementation of a death sentence. See 61 Pa.C.S.A. §§ 3001 through 3008. Those provisions take precedence over any inconsistent regulations promulgated by the Attorney General.

We recognize that issues relating to Mr. Hammer's conditions of confinement while awaiting the implementation of the sentence of death are not within this court's jurisdiction. However, this court imposed the sentence of death. Until that sentence is carried out and the United States Marshal files a return as required by law [8] certifying that Mr. Hammer was executed in accordance with our order and in a manner consistent with the law of the Commonwealth of Pennsylvania this court retains jurisdiction over any matter relating to the implementation of the sentence of death, including the date, time, method of execution[9] and whether an autopsy is conducted.[10]

The implementation of Mr. Hammer's sentence of death is required to be consistent with the procedures set forth in §§ 3001 through 3008, Title 61 of the Pennsylvania Statutes, and those

---

[8]   28 C.F.R. §§ 26.2(b) and 26.4(g); 61 Pa.C.S.A. § 3006.

[9]  61 Pa.C.S.A. § 3004.

[10]  61 Pa.C.S.A. § 3007.

procedures include a section addressing whether an autopsy should be conducted.   That section states that

> [i]mmediately after execution, a postmortem examination[11] of the body of the inmate shall be made at the discretion of the coroner of the county in which the execution is performed.  The coroner shall report the nature of any examination made.  This report shall be annexed to and filed with the certificate required under section [3006].  After the postmortem examination, unless claimed by a relative or relatives, the department shall be responsible for disposition of the body.

61 Pa.C.S.A. § 3007.   Under Pennsylvania law the decision to conduct an autopsy is at the discretion of the county coroner and absent compelling reasons that discretion should not be disturbed.

One reason to disturb that discretion is if Mr. Hammer has a sincerely held religious belief opposing autopsies.

There are religious groups which oppose autopsies. See, e.g., Kickapoo Traditional Tribe of Texas vs. Chacon, 46 F.Supp. 644, 645 (W.D. Tex. 1999)("The issue in this case is whether the Kickapoo Traditional Tribe of Texas (the "Tribe") can prevent authorities of the State of Texas from disinterring the body of one of its tribe members, Ms. Norma Rodriguez, in order to conduct an autopsy to determine how she died.  It brings into play the clash between the Tribe's sincerely held religious beliefs and the State's interest in assuring that the death was not the result of foul play."); Yang vs. Sturner, 750 F.Supp. 558, 558 (D.R.I. 1990)("The Yangs are Hmongs, originally from Laos, and believe that

---

[11]   Webster's Third New International Dictionary (1961) defines "postmortem examination" as "an examination of the body after death usu. with such dissection as will expose the vital organs for determining the cause of death or the character and extent of changes produced by disease: autopsy."

11

autopsies are a mutilation of the body and that as a result 'the spirit of Neng [their son] would not be free, therefore his spirit will come back and take another person in his family.'"); Montgomery vs. County of Clinton, Michigan, 743 F.Supp. 1253, 1257-58 (W.D. Mich. 1990)("[P]laintiff Joan Montgomery, who is Jewish, alleges the performance of the autopsy without her prior notice and consent infringed her First Amendment right to freely exercise her religion.    She believes autopsies are offensive to the tenets of Judaism"); Kohn vs. United States, 591 F.Supp. 568, 572-73 (E.D. N.Y. 1984)("Most religions in the world hold that the remains of a deceased must be treated with honor and respect. Judaism believes in the principle that body and soul are sacred because both are the handiwork of God and hence are entitled to reverence.").

In the declaration filed by him, Mr. Hammer states as follows:

> I have consistently opposed an autopsy on moral and religious grounds.   These are my own personally held sincere religious beliefs based upon my reading, and understanding of the Holy Bible.   Please see:
> 1 Corinthians 3:16-17 "Don't you know that you yourselves are God's Temple and that God's Spirit lives in you?   If anyone destroys God's temple, God will destroy him; for God's Temple is sacred and you are that Temple."   See also: 1 Corinthians 6:19 "Do you not know that your body is a temple of the Holy Spirit, who is in you, whom you have received from God." (New International Version of the Holy Bible).

Mr. Hammer is not required to establish that his religious belief is considered central to his religion.   Thomas vs. Review Bd. of Indiana   Employment   Security   Div.,   450   U.S.   707,   713-14 (1980)("[T]he determination of what is a "religious" belief or practice is more often than not a difficult and delicate task . .

12

. [T]he resolution of that question is not to turn upon a judicial perception of the particular belief or practice in question; religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection."); Hernandez vs. C.I.R., 490 U.S. 680, 609 (1989)("It is not within the judicial ken to question the centrality of religious beliefs or practices to a faith or the validity of particular litigants' interpretation of those creeds."); Muslim vs. Frame, 891 F.Supp. 226, 230 (E.D.Pa 1995)(Pollak, J.)("The Supreme Court has never required that a plaintiff bringing a free exercise claim demonstrate the centrality of a religious practice or belief burdened by the government".). The basic question is whether Mr. Hammer has a sincerely held religious belief.

The government has not contested that Mr. Hammer has a sincerely held religious belief opposing autopsies although it has had ample opportunity to do so. When an inmate has a sincerely held religious belief, before the federal government may substantially burden the exercise of that belief, it must demonstrate that the action to be taken which will infringe the religious belief is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. In re the Grand Jury Empaneling of the Special Grand Jury, 171 F.3d 826, 828-29 (3d Cir. 1999); Adams vs. C.I.R., 170 F.3d 173, 175-76 (3d Cir. 1999); In re Young, 141 F.3d 854, 860-61 (8th Cir.), cert. denied, 525 U.S. 811 (1998).

Neither Vigo County nor the State of Indiana has any

13

valid interest in conducting an autopsy on a federal inmate. The Warden of USP-Terre Haute and the United States Marshal supervising the implementation of the death sentence are the only parties who can argue that they have an interest in conducting an autopsy.

The government has made one basic argument for conducting an autopsy. It has argued that an autopsy is necessary to protect it from a lawsuit filed by Mr. Hammer's next of kin. This interest appears to be compelling. However, conducting an autopsy is not the least restrictive means of furthering that interest.

An external examination of Mr. Hammer by a medical doctor prior to and after the execution, including the taking of a series of photographs and videotaping the execution would protect the government from a lawsuit. Furthermore, Mr. Hammer has agreed to make a statement prior to the execution that he has not been physically abused by prison personnel. This statement could be taken under oath and in the presence of his stand-by attorneys.[12]

Mr. Hammer's religious belief far outweighs the government's interest in an autopsy. We will grant Mr. Hammer's motion to preclude an autopsy.

---

[12] Vigo County also appears to argue that an autopsy is essential to create a legal document, the autopsy report, demonstrating that lethal injection is not cruel and unusual punishment. The federal government has not made this argument. Assuming it is a compelling governmental interest to create a body of evidence indicating that lethal injection is not cruel and unusual, an autopsy is not the least restrictive means to create that body of evidence. Toxicologists and physicians are able to testify regarding the effects on the human body of the chemical substances used in carrying out an execution by lethal injection. Furthermore, the execution could be videotaped to provide additional evidence regarding the effect on the human body of death by lethal injection.

14

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. Mr. Hammer's request that the government be directed to execute him between 10:00 a.m. and 4:00 p.m., and his request that he receive 30 days notice of the exact time of execution are denied.

2. Mr. Hammer's motion to preclude an autopsy (Doc. 715) is granted.

3. The United States Marshal charged with supervising the implementation of the death sentence shall not permit the body of Mr. Hammer to be released to the Coroner of Vigo County, Indiana, for purposes of an autopsy. The United States Marshal may permit the Coroner or other medical professional to conduct an external examination of the body, including the taking of a series of appropriate photographs. The body shall be disposed of consistent with 61 Pa.C.S.A. § 3007.

_____
MUIR, U.S. District Judge

MM:gs

15

County of Vigo          )
                        )                    Declaration of Juan Raul Garza
State of Indiana        )

My name is Juan Raul Garza. I am over 18 years of age and competent to give this declaration.

1.      I have been informed that it is the policy of the Federal Bureau of Prisons to conduct an autopsy on federal inmates who are executed, in order to protect the Federal Bureau of Prisons against civil liability.

2.      I have strong religious and moral objections to an autopsy being conducted after my execution.

3.      I do not think an autopsy would be necessary after my execution. Because the cause of death would be clear, an autopsy would not be necessary to determine the cause. My family members do not desire that an autopsy be conducted, either for detection of disease or for any other purpose.

4.      The Federal Bureau of Prisons' justification for the planned autopsy is to protect the Bureau against civil liability. I am willing to give a sworn statement, immediately prior to my execution, that I have not been physically abused by prison personnel.

I have read the above statement and, under the pain and penalty of perjury, I swear that the above is true and correct to the best of my knowledge. I give this statement of my own free will.

Signed the 7th day of December, 2000.

JUAN RAUL GARZA